Richmond

## F. Lee Cogdill

v.

## Commonwealth Of Virginia

August 31, 1978.

Record No. 771420.

Present: All the Justices.

*Stanley E. Sacks (Sacks and Sacks,* on brief) for plaintiff in error.

*James E. Kulp, Deputy Attorney General (Marshall Coleman, Attorney General,* on brief) for defendant in error.

POFF, J., delivered the opinion of the Court.

This is an appeal from a final judgment order entered June 2, 1977, on a jury verdict finding F. Lee Cogdill guilty of the misdemeanor of procuring for the purpose of prostitution, Code § 18.2-348, and assessing a fine of $500.

Under a limited writ of error, we consider whether the trial court erred in admitting into evidence tape recordings of certain conversations and in denying defendant's plea of entrapment.

On November 16, 1976, Mary Burns, an unmarried 23-year old secretary, approached Cogdill, a 46-year old practicing attorney, for legal advice concerning custody of her illegitimate child. Burns testified that Cogdill advised her that the father "had no legal right . . . unless unfit motherhood could be proven". Cogdill offered her "some of the same advice he gave to all his girls", that is, to "find someone with a lot of money to take care" of her. Cogdill then began to ask questions about her sex life, "how many guys [she] had ever gone to bed with, how old [she] was the first time", whether she was "liberal with [her] sex", and whether she would "go to bed with a guy for money". He told her that some men gave their women "charge cards to buy what they want" and that "some girls made as much as $300 a night for three or four guys and [she] could do the same thing."

Burns complained to the police, and the next day a detective asked her to call Cogdill and arrange another appointment. Burns made the call and, with her consent, the conversation was recorded, apparently by a tape deck attached to Burns' telephone. That afternoon, she returned to Cogdill's office where he prepared a letter addressed to the child's father. While Cogdill's secretary was typing the letter in an outer office, Cogdill "proceeded on with general sex questions", such as "whether [she] had been to bed with a black guy", "how many [men she] could handle in one night", whether she would "do it for . . . drugs, that type of thing". Asked if she had used "all [her] charms to get him to tell [her] these things", Burns said, "I was told to get him to talk" and to lead him into conversation about drugs. She said that she "asked him how people got started" and "[he] said he would show me around and where to find these people, and he would take care of me." At the end of this conversation, which was recorded with the aid of a transmitter concealed in Burns' purse, it was agreed that Burns would call Cogdill the next day "and he would see what he could set up."

In the second telephone conversation, also recorded with Burns' consent, Cogdill "asked me how many [she] could handle" and,

having been told by the detective to "[s]ee if you can set it up now for more than one person", she told him, "as much as you could get." Cogdill "said that he thought it would be better if it was just him, to see how I would like it, and get started into it", suggested a fee of $25, and fixed the hour for her to come to his apartment that evening. Burns kept the appointment and the police recorded the conversation which occurred after she arrived. Burns testified that she asked "if we couldn't get the money out of the way first" and Cogdill gave her $25. At this point, the police entered the apartment, arrested Cogdill, and advised him of his *Miranda* rights. The officers testified that Cogdill told them that "I might as well turn my license in"; that "he knew he should have been suspicious of her when she started asking all those damn questions on the telephone"; and that "I might as well kill myself."

Testifying in his own behalf and maintaining that the questions he asked were designed to determine Burns' fitness as a mother, Cogdill said that he became suspicious of her motives when she asked about drugs because he had heard rumors that the police had been investigating him for more than two years "for some involvement in drugs"; that he pursued the conversation "to play along with her and find out what she really wanted"; that he had no intention of procuring her for the purpose of prostitution; that he gave her the $25 to discover her purpose because "if I hadn't paid her, she would have walked out"; that when he gave her the money she asked: "Where's the drugs?"; that when he replied, "Is that what you're here for?", she said, "You mean you don't smoke pot?"; that both he and she were fully clothed; and that there was no conversation or conduct concerning sex.

Over defendant's objection, tape recordings of the two telephone conversations and that of the conversation during the second meeting in defendant's office were admitted into evidence and played for the jury.[1]

Chapter 6 of Title 19.2 of the Code of Virginia (hereinafter, the Act) regulates both the interception and the disclosure of the contents of intercepted oral and wire communications. Defendant

---

[1] We cannot confidently determine from the record whether the tape of the conversation in defendant's apartment was played for the jury, but for purposes of this opinion we will assume that it was.

concedes that, since Burns gave the police prior consent to record the several conversations, the interceptions were lawful. Code § 19.2-62(2)(b). He maintains, however, that disclosure to the jury was unlawful. He reasons that, except as expressly authorized, disclosure of the contents of information obtained by an interception is a Class 6 felony, Code § 19.2-62(1); that the Act expressly authorizes disclosure in court, but only during certain specified criminal proceedings, Code § 19.2-67(3); and that, because the crime for which he was tried was not one of the offenses specified, disclosure was unlawful.

Focusing first upon the office conversation, defendant says that it was an "oral communication" protected from disclosure because it was one "uttered by a person exhibiting an expectation that such communication is not subject to interception under circumstances justifying such expectations." Code § 19.2-61(2). Defendant contends that the circumstances under which the office conversation was conducted justified his expectation of noninterception. He says that the office door was closed; that he and Burns were the only two people present; that the conversation was terminated when his secretary entered his office and was not resumed until she left; and that "the relationship of the parties was presumed to be privileged and not subject to disclosure."

In passing, we note that the attorney-client privilege does not extend to communications made in contemplation of a crime, *Seventh District Committee* v. *Gunter* , 212 Va. 278, 183 S.E.2d 713 (1971). More on point, quoting from *United States* v. *White,* 401 U.S. 745, 749, *reh. denied,* 402 U.S. 990 (1971), we have only recently decided that a defendant planning a crime has no justifiable expectation of noninterception of his oral communications concerning that crime and must be taken to have assumed the risk of revelation to the police, either through oral disclosure or by way of electronic transmission and recordation. *Wilks* v. *Commonwealth* 217 Va. 885, 234 S.E.2d 250 (1977). Here, the conversation itself was part and parcel of the criminal enterprise.

We conclude that the contents of the tape recording of the office conversation were not protected from disclosure by the Act and that disclosure did not violate defendant's right to privacy vouch-

safed by the Fourth Amendment. *See United States* v. *Pui Kan Lam*, 483 F.2d 1202, 1206 (2d Cir. 1973), *cert. denied*, 415 U.S. 984 (1974).

█ Turning to the recorded telephone conversations, defendant next argues that, inasmuch as the definition of "wire communication" in Code § 19.2-61(1) contains no language such as that contained in the definition of "oral communication", the *Wilks* explication of the "justifiable expectation of noninterception" rule is inapplicable and disclosure to the jury was unlawful.

The Commonwealth argues that the recordation of the telephone conversations did not constitute an interception within the meaning of the Act and that disclosure was not, therefore, proscribed by the Act.

(3) "Intercept" means the aural acquisition of the contents of any wire or oral communication through the use of any electronic, mechanical or other device. . . .

(4) "Electronic, mechanical or other device" means any device or apparatus which can be used to intercept a wire or oral communication other than:

(a) Any telephone or telegraph instrument, equipment or facility, or any component thereof, (i) furnished to the subscriber or user by a communications common carrier in the ordinary course of its business and being used by the subscriber or user in the ordinary course of its business; or (ii) being used by a communications common carrier in the ordinary course of its business, or by an investigative or law-enforcement officer in the ordinary course of his duties. . . .

Code § 19.2-61(3), -61(4).

Interpreting these definitions, we perceive a basic distinction between an interception of the contents of a communication on the one hand and a recording of the contents on the other. The former is an. "aural acquisition", an acquisition by overhearing; the latter is a recordation of what has been thus acquired. The Act proscribes the former when accomplished by use of a defined "device"; the Act does not proscribe the latter, even when accomplished by use of a "device".

Other language in the Act further reflects the legislative purpose to distinguish between an interception and a recording.

The contents of any wire or oral communication *intercepted* by any means authorized by this chapter shall, if possible, be *recorded* on tape or wire or other comparable device. . . .

Code § 19.2-68(7)(a) (emphasis added).

This language is identical to that in the corresponding federal statute, 18 US.C. § 2518(8)(a); and Virginia's definition of "intercept" is the same as that used in 18 U.S.C. § 2510(4). Construing these federal statutes and rejecting the argument that a tape recorder connected to a telephone receiver was an interception "device", the court in *United States* v. *Harpel*, 493 F.2d 346, 350 (10th Cir. 1974) said:

We agree with appellant that the recording of a conversation is immaterial when the overhearing is itself legal. It is the means whereby the contents of the conversation are acquired that is crucial. . . . A recording device placed next to, or connected with, a telephone receiver cannot itself be the "acquiring" mechanism. It is the receiver which serves this function--the recorder is a mere accessory designed to preserve the contents of the communication. This interpretation comports squarely with the clear distinction drawn between "intercepting" and "recording" under 18 U.S.C. § 2518(8)(a), which deals with judicially authorized interceptions. . . . We therefore conclude that the tape recorder in question cannot constitute the intercepting mechanism when used, as it is argued here, connected to a telephone receiver.

*Accord, State* v. *Gora*, 148 N.J. Super. 582, 372 A.2d 1335 (1977); *State* v. *McCartin*, 135 N.J. Super. 81, 342 A.2d 591 (1975); *Williams* v. *State*, 507 P.2d 1339 (Okla. Crim. App. 1973); *Smith* v. *Wunker*, 356 F. Supp. 44 (S.D. Ohio 1972).

Under the express language of the statute, Burns' telephone, an instrument "furnished to the subscriber or user by a communications common carrier in the ordinary course of its business and being used by the subscriber or user in the ordinary course of its business", was excluded from the definition of an interception "device". The use of that instrument for the "aural acquisition" of

a communication was exempt from the proscription of the Act. The recording of the information lawfully acquired by that instrument was not, therefore, an interception of a communication within the meaning of the Act, and we hold that the tape recordings of the telephone conversations were properly admitted in evidence and played for the jury.

Defendant's motion to strike the Commonwealth's evidence on the grounds of entrapment was denied and his proffered instructions on entrapment were refused, and he assigns error to both rulings.

■ We have repeatedly held that, when the criminal design originates in the mind of the accused and, thereafter, the Commonwealth does no more than afford an opportunity for the commission of the crime, the defense of entrapment does not lie. Whether the criminal design originated with the accused or was first conceived by the police may, in some cases, be a question of fact for the jury. No such question exists in this case.

Burns' account of defendant's questions, comments, and advice during the original meeting in his office fully support the conclusion that defendant alone initiated the criminal design with which he was charged. Indeed, at that time, the police had not entered the picture. Thus, there was no evidence whatever to support an instruction defining a basic element of the defense of entrapment.

■ Defendant contends that, even if the police did not initiate the criminal design, there was evidence to show that their conduct following the original meeting induced defendant to commit an offense he otherwise would not have committed and that such evidence entitled him to jury instructions on entrapment. We do not agree. Rather, we believe

> [w]hen the evidence is viewed in the light most favorable to the theory of entrapment, it is clear that all the police. . . did was to afford an opportunity for the commission of the offense, an opportunity the defendant willingly accepted. Therefore, the evidence was insufficient, as a matter of law, to create a jury issue on entrapment.

*Neighbors* v. *Commonwealth*, 214 Va. 18, 19, 197 S.E. 2d 207, 208-09 (1973) (citations ommitted).

Finding no error in the court below, we will affirm the judgment.

*Affirmed*.