RONALD WATKINS

V.

COMMONWEALTH OF VIRGINIA

Record Nos. 890094 and 890095

September 22, 1989

Present: All the Justices

*David A. Melesco* for appellant.

*Mark S. Gardner,* for appellant, on ineffective assistance of counsel claim).

*David A. Rosenberg, Assistant Attorney General (Mary Sue Terry, Attorney General,* on brief), for appellee.

Justice Russell delivered the opinion of the Court.

Ronald Watkins was convicted by a jury of robbery and of capital murder in the commission of robbery while armed with a deadly weapon, Code § 18.2-31(d). At the conclusion of the first stage of the bifurcated trial, the jury fixed his punishment at life imprisonment on the robbery count. At the penalty stage of the trial, after hearing evidence of aggravating and mitigating circumstances, the jury returned a unanimous verdict fixing Watkins' punishment at death for capital murder.

The jury based its verdict on both the "future dangerousness" and "vileness" predicates of Code § 19.2-264.4(C). In support of the "vileness" predicate, the jury made findings of both "depravity of mind" and "aggravated battery." After reviewing a pre-sentence report and after a further hearing, the court entered judgment by final orders entered November 2, 1988, imposing the penalties fixed by the jury.

Watkins' appeal of his capital murder conviction has been consolidated with the automatic review of his death sentence required by Code § 17-110.1. We have also certified from the Court of Appeals of Virginia the record of Watkins' robbery conviction pursuant to Code § 17-116.06. Both appeals have been given priority on our docket.

## I. THE EVIDENCE

William Martin McCauley operated a business called Allied Services in a shopping center in Danville. He lived with his parents. On the evening of Thursday, May 26, 1988, after he had failed to return home by 7:00 p.m., his father, Dr. Ralph McCauley, became concerned and telephoned Allied Services twice. Receiving no answer, Dr. McCauley drove to Allied Services about 7:30 p.m. Entering through the unlocked front door of the store, Dr. McCauley found his son's body lying in a pool of blood, face down on the floor in a storage area at the rear. The victim's hair was combed, not in disarray. His glasses were in place. His arms were at his sides and his feet were together. Dr. McCauley found that his son's skin was "cold and gray" and that there was no pulse.

The victim's left hip pocket was unbuttoned, and his wallet was missing. A nearby filing cabinet drawer was customarily used as a repository for about $1,000 in cash which was used to honor Western Union wire transfers. The drawer was open, the cash was missing, and a trail of drops of blood led from the location of the body to the drawer. The drawer of the cash register was also open and empty, except for small change.

The medical examiner determined that the victim's neck had been slashed in three areas, cutting the jugular vein on both sides and severing the carotid artery on both sides. The victim had also received seven stab wounds in the upper back. One of these had penetrated the right lung. That wound, as well as each of the three neck wounds, would have been independently lethal. The medical examiner concluded from the condition of the body and the location of the blood that all wounds had been inflicted while the victim was either kneeling or lying face down on the floor, in the very position in which his body was found.

The defendant, Ronald Watkins, had known the victim for some time. Watkins' sister had worked at Allied Services, and Watkins himself had worked there one day to repay a $25 debt he owed the victim. Watkins knew that $1,000 was invariably kept in the file cabinet drawer.

Watkins had spent most of the day of the murder at a motel with a woman named Sina Mayo. He left her in the late afternoon and returned at night. An employee of Allied Services, Joyce Kernodle, saw Watkins in the store as she was preparing to leave, just before 5:00 p.m. on the day of the killing. The victim, Wil-

liam McCauley, was the only other person present. McCauley asked Watkins to leave; Watkins went out and stood near a bench just outside the door. Miss Kernodle saw Watkins near the bench when she left at 5:00 p.m.

The police questioned Sina Mayo, who agreed to permit a tape recorder to be attached to her telephone. Watkins called her home several times during the next few days, and she, her sister, Tammy Moffitt, and her brother, Philip Jones, all recorded their conversations with him. In the conversation with Philip Jones, Watkins admitted killing McCauley, and said that it was necessary because McCauley knew him.

On May 31, Watkins called the Danville Police Department and asked to speak with Detective W. I. Holley. Holley was unavailable and Captain C. W. Howerton took the call. Watkins told Howerton that Sina Mayo knew nothing about the killing. Watkins stated that he had gone alone to Allied Services, robbed "Bill" of over $1,000, and "knifed" him. Watkins did not disclose his whereabouts, but indicated that he might come to the police station voluntarily to discuss the matter further. He failed to appear. Later that evening, Watkins called Sina Mayo to arrange a rendezvous. She told the police the designated time and place, and Watkins was arrested when he met her.

At the police station, Watkins was given *Miranda* warnings, waived his rights, and gave voluntary, tape-recorded confessions to the police. He stated that he knew that substantial amounts of cash were kept on the premises and that he knew that the "help . . . would get off at 5:00 p.m." He said that he took "about $1,000" from the filing cabinet drawer, about $200, which was all the paper money, from the cash register, and that he then stabbed McCauley and "cut his throat."

## II. VOIR DIRE

Watkins is black; the victim was white. Before trial, the defense ascertained that of the 35 veniremen summoned for his trial, only five were black. The defense produced evidence that the black population of Danville constituted nearly 30% of the whole; it moved to discharge the venire on the ground that its composition alone was evidence of a policy of systematic exclusion of the minority. The court stated that the venire was drawn by a computer at random from the list of prospective jurors compiled by the jury commissioners, who were instructed to take names from the list of

registered voters and such other lists as they may find will "fairly and adequately represent a cross-section of the community."

The court further stated that the computer-selected names were retained in a locked box in the clerk's office until the judge, in the presence of two deputy clerks, drew at random sufficient names from the box to insure an adequate number of veniremen to make up the jury list prior to the opening of each term of court. The names contained no notation of race. The court stated that this process had produced, during the course of 1988, some juries with blacks "in the majority or near-majority" as well as juries with a white majority; the gender balance also varied from one jury to another, but this was a necessary consequence of the random selection process. The court denied the motion, stating that it would be impossible to achieve a racial balance reflecting the exact population ratio for any particular trial unless the jury were "fixed" by ascertaining the races of the veniremen after they arrived at court, and calling them to the jury box on the basis of race.

After 20 veniremen had been subjected to voir dire, the court, by agreement, excused two for cause, reducing the panel to 18. It was then necessary to call two additional veniremen. The commonwealth's attorney noted that only one black prospective juror remained among the 18, and that of the remaining veniremen from which the two vacancies must be filled, three were black. The commonwealth's attorney suggested that "two of the three blacks be placed on the panel . . . in order to insure as many blacks as possible on this panel . . . if the Court and counsel will agree to that." Defense counsel said "I can't agree or disagree to this, Your Honor." The court then directed the clerk to proceed with random selection by drawing two "names from the box." After each side had exercised its four peremptory strikes, a jury was impanelled which consisted of one black and eleven white members.

Watkins makes no contention that the jury selection process was unlawful and makes no showing of any policy of, or effort toward, systematic exclusion of members of his race from this particular jury panel, or from the jury list in general. Further, he makes no showing of a history of under-representation of minorities on Danville juries. He simply contends that he was constitu-

tionally entitled to a jury that mirrored the racial composition of the community.[1]

■ The Supreme Court has consistently adhered to the view that there is no requirement that a petit jury actually chosen must mirror the racial balance of the community. Further, no litigant is entitled to a jury of any particular composition. All that is required is a fair selection system which does not systematically exclude any distinctive group in the community. *Taylor* v. *Louisiana*, 419 U.S. 522, 538 (1975). In order to make out a prima facie case of systematic exclusion, a litigant must show consistent under-representation of a distinctive group on juries in the community over a period of time. Such under-representation in a particular case is not sufficient. *See Castaneda* v. *Partida*, 430 U.S. 482, 494 (1977). As Watkins concedes, there was no showing of historic under-representation here.

## III. RECORDED TELEPHONE CONVERSATIONS

Watkins assigns error to the court's admission into evidence of his tape-recorded conversations with Sina Mayo, Tammy Moffitt, and Philip Jones. Watkins asserts that the police threatened Sina Mayo with prosecution as an accessory after the fact if she refused to cooperate, and that she consented to the installation of a tape recorder on her telephone only in response to that threat. He argues that her consent to the recording, being "coerced," was invalid.

■ We held, in *Cogdill* v. *Commonwealth*, 219 Va. 272, 277-79, 247 S.E.2d 392, 396 (1978), that a telephone conversation recorded by or with the consent of one of the parties to the communication is not an "interception" within the meaning of the wiretap statutes. We further held that such a voluntarily recorded conversation was properly admitted in evidence. *Id.*

■ If a party to a conversation consents to record it only under duress, the argument may be made that the rule announced in *Cogdill* is inapplicable. Such coercion, however, must overbear the

---

[1] Watkins cites a 1984 California case for the proposition that minorities register to vote in lower proportion than the general population, and that the jury commissioner's reliance on the use of the list of registered voters makes out a prima facie case of systematic exclusion which the Commonwealth failed to rebut. We reject Watkins' premise. Although the General Assembly recently (1989 Acts, cc. 616, 632) authorized the use, by jury commissioners, of other lists in addition to the list of registered voters, we perceive no rational basis for the conclusion that reliance on the voters list is in any way discriminatory.

will of the party; it must amount to duress before it will vitiate the consent. It is not sufficient to show that the party consented to record the conversation merely to advance his own interests, to avoid prosecution, or to gain some advantage for himself or another. *See United States* v. *Jones*, 839 F.2d 1041, 1050-51 (5th Cir. 1988), *cert. denied*, 108 S.Ct. 1999 (1988); *United States* v. *Kelly*, 708 F.2d 121, 126 (3rd Cir. 1983), *cert. denied*, 464 U.S. 916 (1983); *United States* v. *Kolodziej*, 706 F.2d 590, 593 (5th Cir. 1983).

Viewed in that light, it is obvious that Sina Mayo's consent to record the conversations was not coerced. After she permitted the police to install the tape recorder, the police turned the recorder off and left her premises. The decision whether to turn the equipment on at any time was left entirely to her. Further, there was no indication of any motivation on the part of her sister and brother to record their conversations except a willingness to help the police find Watkins. Both voluntarily recorded their conversations with him. The evidence most damaging to Watkins emerged from his recorded conversation with Sina Mayo's brother, Philip Jones, in which Watkins stated that he had to kill McCauley because McCauley knew him. Jones voluntarily recorded that conversation when no one else was present. The court correctly admitted the recordings.

## IV. CORROBORATION OF CONFESSIONS

At the guilt phase of trial, Watkins tendered instruction "A": "The court instructs the jury that a conviction cannot be based solely on the uncorroborated confession of the defendant." Watkins assigns error to the court's refusal of the instruction.

In our view, the ruling was correct. The controlling principles are familiar. It is true that, as a general principle of law, an accused cannot be convicted solely on his uncorroborated extrajudicial admission or confession. The *corpus delicti* must be corroborated. *Cleek* v. *Commonwealth*, 165 Va. 697, 698, 181 S.E. 359, 360 (1935). It is not necessary, however, that there be independent corroboration of all the contents of the confession, or even of all the elements of the crime. The requirement of corroboration is limited to the facts constituting the *corpus delicti*. *See Campbell* v. *Commonwealth*, 194 Va. 825, 833-34, 75 S.E.2d 468, 473-74 (1953). Further, where, as here, the accused has fully confessed the crime, only *slight* corroborative evidence is necessary to estab-

lish the *corpus delicti. Clozza* v. *Commonwealth*, 228 Va. 124, 133, 321 S.E.2d 273, 279 (1984), *cert. denied*, 469 U.S. 1230 (1985).

The confession is itself competent evidence tending to prove the *corpus delicti*, and all that is required of the Commonwealth in such a case is to present evidence of such circumstances as will, when taken in connection with the confession, establish the *corpus delicti* beyond a reasonable doubt. *Cleek*, 165 Va. at 699, 181 S.E. at 360. Further, corroborative facts supporting the *corpus delicti* may be furnished by circumstantial evidence as readily as by direct evidence. *Epperly* v. *Commonwealth*, 224 Va. 214, 229, 294 S.E.2d 882, 891 (1982). Indeed, we commented in *Epperly* that because circumstantial evidence is not subject to the human frailties of perception, memory, and truthful recital, it is often more reliable than the accounts of eyewitnesses. *Id.* at 228, 294 S.E.2d at 890.

Examining the present record in light of those principles, we conclude that the facts constituting the *corpus delicti* of both crimes were abundantly corroborated. The condition of McCauley's mutilated body and the location of the bloodstains are in themselves sufficient evidence of the *corpus delicti* of a homicide. *See Epperly*, 224 Va. at 229, 294 S.E.2d at 891 (in homicide cases, the *corpus delicti* consists of proof (1) of the victim's death, and (2) that it resulted from the criminal act or agency of another). That same evidence of violent force, coupled with the evidence of bloodstains leading to the file cabinet drawer where cash had been kept, and the cash missing from the scene, constitutes sufficient proof of the *corpus delicti* of a robbery. *See Williams* v. *Commonwealth*, 234 Va. 168, 175, 360 S.E.2d 361, 366 (1987), *cert. denied*, 484 U.S. 1020 (1988). Thus, the court did not err in refusing to exclude the confessions for lack of corroboration. Once admitted in evidence, the confessions, in conjunction with the corroborating circumstantial evidence, constituted overwhelming proof of Watkins' guilt of both crimes.[2]

In these circumstances, was the trial court required to instruct the jury that a conviction may not be based upon the "uncorroborated confession of the defendant"? Having reexamined our holdings in *Plymale* v. *Commonwealth*, 195 Va. 582, 79

---

[2] For this reason, it is unnecessary to discuss Watkins' contention that the record contains insufficient evidence to go to the jury on the robbery charge.

S.E.2d 610 (1954), and *Wheeler* v. *Commonwealth*, 192 Va. 665, 66 S.E.2d 605 (1951), we think not. If the court had found the *corpus delicti* to be uncorroborated outside the confessions, it would have been the court's duty to exclude the confessions and to strike the Commonwealth's evidence at the close of the prosecution case in chief. Instead, the court correctly ruled, as a threshold matter of law, that the confessions were sufficiently corroborated. The court therefore admitted them and denied Watkins' motion to strike. The court was under no obligation to submit that legal ruling for redetermination by the jury. The court's ruling was subject to appeal if erroneous, but at trial, it became the law of the case. We are unwilling to say that the jury was empowered to overrule the court upon the question whether the *corpus delicti* was independently corroborated.[3]

Jury instructions must be based upon evidence; it is error to grant an instruction which is unsupported by evidence. *LeVasseur* v. *Commonwealth*, 225 Va. 564, 590, 304 S.E.2d 644, 658 (1983), *cert. denied*, 464 U.S. 1063 (1984). Instruction "A", requested by Watkins, describes his confessions as "uncorroborated." As indicated above, no rational view of the evidence would justify that description. After the court had determined, as a matter of law, that the confessions were sufficiently corroborated to go to the jury, granting a jury instruction describing them as "uncorroborated," or requiring the jury to decide whether they were corroborated or not, would indeed be incongruous.

Accordingly, we hold that where the court has made a threshold determination that sufficient corroboration of the *corpus delicti* has been adduced, independent of a confession, to permit the con-

---

[3] The jury had, of course, unfettered authority with respect to the interpretation it might give to the circumstantial evidence, or the weight it might give to any evidence, including the confessions themselves. That authority was covered in the other instructions given by the court, and would not justify the instruction here under consideration. The court's instructions set forth each of the elements of capital murder, first degree murder, and robbery. They told the jury that the Commonwealth had the burden of proving each element beyond a reasonable doubt, and if the Commonwealth failed to do so with respect to any one or more of the elements of any offense, the jury must acquit the defendant of that offense. Proof of the elements of an offense, of course, includes proof of the *corpus delicti*.

Watkins makes no contention that the confessions were involuntary. Therefore, we are not confronted with the situation in which the court, having found a confession voluntary for the purpose of admissibility, must also submit the question of voluntariness to the jury for its determination of weight. *Cf. Mathews* v. *Commonwealth*, 207 Va. 915, 918-19, 153 S.E.2d 238, 240 (1967).

fession to go to the jury, an instruction submitting the issue of corroboration to the jury is inappropriate.[4] To the extent that our holdings in *Plymale* v. *Commonwealth*, 195 Va. 582, 597, 79 S.E.2d 610, 618 (1954) and *Wheeler* v. *Commonwealth*, 192 Va. 665, 670-71, 66 S.E.2d 605, 608 (1951) are in conflict with this holding, those cases are overruled.

## V. DISCLOSURE OF PAROLE ELIGIBILITY

At the penalty stage of the trial, before final argument, defense counsel requested the court's permission to "discuss with the jury the parole eligibility for my client so that they would know he would be in the penitentiary for a minimum . . . of twenty years." The court sustained the Commonwealth's objection and Watkins assigns error to the ruling. Watkins acknowledges that our decisions have consistently foreclosed evidence or instructions informing the jury of a defendant's parole eligibility in the event of a life sentence. *O'Dell* v. *Commonwealth*, 234 Va. 672, 701, 364 S.E.2d 491, 507, *cert. denied*, 488 U.S. ____, 109 S.Ct. 186 (1988); *Williams* v. *Commonwealth*, 234 Va. at 178-80, 360 S.E.2d at 367-68; *Poyner* v. *Commonwealth*, 229 Va. 401, 432, 329 S.E.2d 815, 836-37, *cert. denied*, 474 U.S. 888 (1985). Watkins, however, relying on a different view expressed in *Doering* v. *State*, 313 Md. 384, 411-12, 545 A.2d 1281, 1295 (1988), invites us to change our position. Having carefully considered the reasons underlying our decisions, we decline that invitation.

## VI. CONSTITUTIONALITY

Watkins argues that the "future dangerousness" predicate contained in Code § 19.2-264.4(C) violates the Double Jeopardy clause of the Fifth Amendment to the Federal Constitution, that the "vileness" predicate contained in the same statute is unconstitutionally vague, and that the total Virginia statutory scheme gov-

---

[4] We made an analogous holding in *Dillard* v. *Commonwealth*, 216 Va. 820, 821-22, 224 S.E.2d 137, 139 (1976), where we held that a cautionary instruction concerning the uncorroborated testimony of an accomplice was inappropriate where the court determined, as a threshold matter of law, that corroboration existed. The difference is that a defendant *may* be convicted on the uncorroborated testimony of an accomplice (unlike an uncorroborated confession) and in the absence of corroboration, a cautionary instruction should be given. The analogy holds, however, where the court finds corroboration to be present. *See also Clark* v. *Commonwealth*, 219 Va. 237, 242, 247 S.E.2d 376, 379 (1978); *Allard* v. *Commonwealth*, 218 Va. 988, 990, 243 S.E.2d 216, 217 (1978).

erning capital offenses (Code §§ 19.2-264.2 through 19.2-264.5) violates the Eighth and Fourteenth Amendments of the Federal Constitution.[5]

■ We have repeatedly upheld the constitutionality of the statutory scheme. The use of prior criminal convictions and prior unadjudicated criminal conduct as evidence of "future dangerousness" has been consistently approved. *See, e.g., Pruett v. Commonwealth*, 232 Va. 266, 285, 351 S.E.2d 1, 12 (1986), *cert. denied*, 482 U.S. 931 (1987); *Stamper v. Commonwealth*, 220 Va. 260, 276, 257 S.E.2d 808, 820 (1979), *cert. denied*, 445 U.S. 972 (1980). Evidence tending to show future dangerousness does not offend the Double Jeopardy clause. *State v. Gaskins*, 326 S.E.2d 132, 145 (S.C.), *cert. denied*, 471 U.S. 1120 (1985).

■ The "vileness" predicate is constitutionally valid. *James Dyral Briley v. Commonwealth*, 221 Va. 563, 577-80, 273 S.E.2d 57, 66-67 (1980); *Turner v. Commonwealth*, 221 Va. 513, 526, 273 S.E.2d 36, 45 (1980), *cert. denied*, 451 U.S. 1011 (1981); *Smith v. Commonwealth*, 219 Va. 455, 478-79, 248 S.E.2d 135, 149 (1978), *cert. denied*, 441 U.S. 967 (1979).

The statutory scheme violates neither the Eighth nor the Fourteenth Amendment to the Federal Constitution. *Pope v. Commonwealth*, 234 Va. 114, 121-22, 360 S.E.2d 352, 357 (1987), *cert. denied*, 485 U.S. 1015 (1988). *Bassett v. Commonwealth*, 222 Va. 844, 851-52, 284 S.E.2d 844, 849 (1981), *cert. denied*, 456 U.S. 938 (1982); *Smith v. Commonwealth*, 219 Va. at 476, 248 S.E.2d at 148.

## VII. PASSION, PREJUDICE, AND PROPORTIONALITY

Watkins concedes that his death sentence is not facially disproportionate to the penalties imposed in similar cases. He argues, however, that it was influenced by racial prejudice. In support of this contention, he relies on records of the trial court which show that since 1980, five defendants, including himself, have been tried for capital murder in Danville. Four of the defendants were black; one was white. Because some cases involved multiple killings, there were seven victims, three of whom, including McCauley,

---

[5] Watkins also argues on brief that the use of prior unadjudicated criminal conduct to prove "future dangerousness" is unconstitutional unless the court specifies the standard of proof governing the establishment of such conduct. Because this argument was not presented to the trial court, we will not consider it. Rule 5:25.

were white, four of whom were black. The death penalty was imposed by juries in the cases of all four black defendants, but the trial judge set the verdict aside in the case of one black defendant and imposed life imprisonment.

The sole white defendant was an 18-year-old who, while intoxicated, struck another white youth over the head with a bottle during a drunken quarrel on a riverbank. The defendant took $1.00 from the victim. The victim fell into the river and drowned. The case was tried without a jury. Although the Commonwealth sought the death penalty, the court declined to impose it.

■ Upon this background, Watkins seeks to show that racial prejudice influenced the penalty imposed by the jury in his case. We find the evidence wholly insufficient to support his claim. No evidence was adduced concerning the relative atrociousness of the other capital cases in which black defendants were involved, and Watkins failed to show that the races of the victims made any difference. More to the point, Watkins failed to prove any factors indicating that the jurors in *his* case acted with any discriminatory purpose. *McCleskey* v. *Kemp*, 481 U.S. 279, 292 (1987).

## VIII. CONCLUSION

■ Finding no error in the record, and finding that the death sentence was not influenced by passion, prejudice, or any other arbitrary factor, we will affirm the convictions and the appealed judgments.

Record No. 890094 — *Affirmed.*
Record No. 890095 — *Affirmed.*

Justice Whiting, dissenting.

I cannot agree with that part of the majority opinion which sustains the trial court's refusal of Instruction "A." In my opinion, such approval not only overrules at least two Virginia cases enunciating a basic principle of criminal law, but also sanctions a clear violation of Watkins's constitutional rights.

This case differs from one in which a defendant loses his entitlement to an instruction warning the jury of the danger of conviction based on an accomplice's uncorroborated testimony, where there is evidence of "material facts which tend to connect the accused with the crime, sufficient to warrant the jury in crediting the truth of" such testimony. *Dillard* v. *Commonwealth*, 216 Va.

820, 823, 224 S.E.2d 137, 140 (1976). In that instance, the trial court decides whether sufficient corroborative evidence has been introduced to obviate the necessity of the cautionary instruction. *Clark* v. *Commonwealth*, 219 Va. 237, 242, 247 S.E.2d 376, 379 (1978); *Allard* v. *Commonwealth*, 218 Va. 988, 993, 243 S.E.2d 216, 219 (1978); *Dillard*, 216 Va. at 824, 224 S.E.2d at 140.

Although the majority recognizes the difference between a jury's *right* to convict on the uncorroborated testimony of an accomplice and its *inability* to convict on the uncorroborated confession of the defendant, it analogizes the two situations where corroboration exists. I believe that the analogy is flawed; a jury's consideration of the credit to be given one witness's testimony differs greatly from its ultimate decision as to whether the essential elements of the crime have been proven.

The difference is illustrated in a comparison of our holdings on these two issues. *Dillard* and its progeny are based on the premise that whether such standard of corroboration "has been met is a legal question for the court, not a factual question for the jury." *Id.* at 824, 224 S.E.2d at 140. In contrast, although not articulated as the reason for our previous holdings in *Plymale* v. *Commonwealth*, 195 Va. 582, 597, 79 S.E.2d 610, 618 (1954), and *Wheeler* v. *Commonwealth*, 192 Va. 665, 671, 66 S.E.2d 605, 608 (1951), it is implicit that the issue whether the *corpus delicti* has been established is for the jury to decide, because in each we noted that the evidence was ample to establish the *corpus delicti*, yet reversed because the same issue involved here was not submitted to the jury. *Plymale*, 195 Va. at 588, 79 S.E.2d at 613; *Wheeler*, 192 Va. at 670, 66 S.E.2d at 607-08. Indeed, we said, "[i]t was vital to the protection of the rights of the accused that the jury be properly instructed as to the proof of the *corpus delicti* and the limitations on the use of his confession and admission for that purpose." *Wheeler*, 192 Va. at 670-71, 66 S.E.2d at 608.

Although the majority holds that "[w]e are unwilling to say that the jury was empowered to overrule the court upon the question whether the *corpus delicti* was independently corroborated," it in fact supports that proposition in footnote 2. Footnote 2 indicates that the jury instructions regarding burden of proof of the elements of the crime, including proof of the *corpus delicti*, adequately protect Watkins's rights. The majority bases this conclusion on the jury's "unfettered authority with respect to the interpretation it might give to the circumstantial evidence, or the

weight it might give to any evidence, including the confessions themselves." Practically speaking, this suggests that a jury may assess and weigh the evidence which independently corroborates the *corpus delicti*. This conflicts, however, with the majority's conclusion that the court, and not the jury, decides that issue. Therefore if, as the majority states, the jury cannot overrule the court on whether the *corpus delicti* has been independently corroborated, I fail to see how those instructions protect Watkins's right to have the jury pass on the credibility and weight of the evidence.

In my opinion, at least one of the rights referred to in *Wheeler* is a defendant's right to have the jury pass upon the sufficiency of the proof of all elements of the crime. This right is a basic tenet of the common law. *Morissette v. United States*, 342 U.S. 246, 274-76 (1952); *People v. Flack et al.*, 125 N.Y. 324, 334, 26 N.E. 267, 270 (1891). It is also a due process right protected by the Fourteenth Amendment to the Constitution of the United States. The right of a defendant, charged with a serious crime, to have a jury pass upon all the elements thereof was articulated as the reason for two rulings reversing state court convictions resting on evidentiary presumptions, which attempted to relieve the state of its burden of proof of every essential element of the crime by shifting part of the burden to the defendant. *Francis v. Franklin*, 471 U.S. 307, 313 (1985); *Sandstrom v. Montana*, 442 U.S. 510, 523-24 (1979). If shifting a part of the burden of proof to the defendant in a criminal case violates his right to a jury trial, surely refusal to instruct on the requisite proof of the *corpus delicti* is at least an equal violation of that right.

Accordingly, I believe the issue of whether the *corpus delicti* has been established is not a legal question for the court, but a factual one for the jury. Therefore, I would affirm all the holdings of the trial court except that refusing Instruction "A," reverse the judgment, and remand the case for further proceedings consistent with this dissent.