COURT OF APPEALS OF VIRGINIA


Present:  Judges Benton, Clements and Senior Judge Hodges
Argued at Richmond, Virginia


BERNARD JERE MEMBER
                                        MEMORANDUM OPINION[*] BY
v.    Record No. 2125-02-2        JUDGE JAMES W. BENTON, JR.
                                           SEPTEMBER 9, 2003
COMMONWEALTH OF VIRGINIA


             FROM THE CIRCUIT COURT OF SPOTSYLVANIA COUNTY
                    William H. Ledbetter, Jr., Judge

            Mark S. Gardner (Gardner, Maupin & Sutton,
            P.C., on brief), for appellant.

            Virginia S. Theisen, Assistant Attorney
            General (Jerry W. Kilgore, Attorney General,
            on brief), for appellee.


     A jury acquitted Bernard Jere Member, a physician, of

involuntary manslaughter and convicted him of unlawful

distribution of a controlled substance in violation of Code

§ 18.2-248.  Member contends the trial judge erred (1) by not

ordering a separate trial for the distribution charge, (2) by

permitting evidence indicating that the Board of Medicine has

ruled the dispensing of a Schedule II controlled substance is

unlawful except by prescription, and (3) in not striking as

insufficient the evidence concerning distribution of a controlled

substance.  We affirm the conviction.

_____

     * Pursuant to Code § 17.1-413, this opinion is not
designated for publication.

A grand jury indicted Member on charges of second degree murder, involuntary manslaughter, and unlawful distribution of a Schedule II controlled substance.  See Code §§ 18.2-248 and 54.1-3448.  Prior to the trial, Member filed a motion to separate for trial the distribution charge from the homicide charges. After considering the attorneys' arguments, the trial judge denied the motion.

The evidence at trial proved Member and Laura Feury married in 1995 and separated in February 1999.  After the separation, Feury worked in Member's medical office as a bookkeeper and continued to work there after they were divorced in May 2001. Member is a physician who is certified in psychiatry and maintains a psychiatry practice in Spotsylvania County.  He also is certified as a pediatric oncologist and, in the past, practiced as a pediatric oncologist for more than ten years.

Feury was found dead in her bed June 16, 2001.  Feury's head was on a pillow; a book was on the bed by her knee; an electronic heating pad was under the small of her back or hip area. Dr. William Gromley, the assistant chief medical examiner, testified that he found four duragesic patches on Feury's back. Each patch contained the active ingredient Fentanyl, which is an opiate pain reliever, and each patch was labeled "twenty-five micro-grams per hour" and designed to last seventy-two hours. Dr. Gromley testified that Fentanyl primarily is used by

terminal cancer patients requiring chronic pain medication.  He concluded that Feury died of Fentanyl poisoning.

A detective contacted Member by telephone and informed him of Feury's death.  After learning Dr. Gromley's conclusion, the detective contacted Member again and told him they found some patches on the small of Feury's back.  Member said "oh, no, please don't tell me that."  Later in the conversation, when Member was again questioned about the patches, he said, "I'm fucked."  The detective testified that he heard Member drop the telephone and moan in the background.  Member eventually returned to the telephone and continued the conversation.  In this conversation and in a later conversation with the detective, Member said he had visited his elderly mother in New York several months earlier after he learned she had been unsteady on her feet.  He discovered that she was using Fentanyl patches and became concerned about her use of the medication.  Believing it was improper for his elderly mother to use the patches, Member took them and brought them to his home.  Member said Feury, who suffered from endometriosis and experienced severe pain during her menstrual period, "had somehow seen the patches and asked . . . about the patches."  Member said he gave the box containing three or four Fentanyl patches to Feury, had encouraged Feury to use heating pads when she had severe menstrual pain, and did not encourage her to use the heating pads when she wore the Fentanyl patches.

In his third conversation with the detective, Member said he had taken the Fentanyl patches to his office, not his home. In that same interview, Member said he directed Feury "only to use one; if she was going to use one, to use one only, and reiterated once again not to use a heating pad with this patch." When asked of Feury's history, Member said she "had worked for him in his office as a bookkeeper[,] . . . she recently had complained of . . . soreness in her abdomen and rebound tenderness," and she was seeing a doctor for a gallbladder problem. Member indicated he was not Feury's doctor, but he had prescribed Lortab to Feury in the past for menstrual cramping. Member said he did not establish a medical file for Feury after he gave her the Lortab prescription. Member became emotional during the interview and said he had warned Feury of the potency of the Fentanyl patches.

Julie Pearson, who has a Ph.D in pharmacology and toxicology and is the toxicology supervisor for the Division of Forensic Science, testified that Fentanyl is a synthetic opiate, that it is the most potent opiate on the market, and that it is about a hundred times more potent than morphine. Pearson described Fentanyl as a "last ditch drug" that is used to treat severe and chronic pain and given often to terminally ill patients. Although Pearson testified that Fentanyl is not recommended for patients who weigh less than one hundred twenty pounds, she noted that Fentanyl may be used for an underweight

patient who has experience with opiates. Pearson also testified that Fentanyl should "really never ever be used in someone who doesn't have some tolerance to opiates," that Fentanyl patients need to be warned to wear one patch at a time, and that patients must be warned heat can enhance the absorption of the drug.

Without objection, Pearson additionally testified that Fentanyl is a Schedule II drug in Virginia and that a Schedule II drug is the most potent drug that may be prescribed by a doctor. She explained that a Schedule I drug is always illicit and that a Schedule II drug, although equally dangerous, has medicinal purposes.

Vicky Gwaltney-Garrison, a pharmacist and the pharmacy inspector for the Department of Health Professions, testified that she investigated Member's prescribing of medication for Feury. Member told her he had prescribed Adderall, Lortab, Tylenol III with codeine, and Prozac. During her conversations, Member "admitted . . . he did not prescribe [Fentanyl]" for Feury and that when he gave the patches to Feury he failed to provide her with dosing instructions. He said he told Feury, however, that Fentanyl was a very strong drug. Gwaltney-Garrison also testified Member had a "very brief record" of his treatment of Feury that did not document the prescriptions.

Member testified that he treated Feury's psychiatric problems while she was working for him and prescribed various

- 5 -

types of drugs for those problems. He said he accompanied Feury on several visits to her doctor when she sought treatment for her painful endometriosis disease. Member explained that he "temporarily took over the management of [her] recurrent pain" after her gynecologist relocated; he said he could appropriately manage the pain she was experiencing.

Member testified that Feury, who weighed less then one hundred twenty pounds, was not experiencing pain when he gave her the Fentanyl patches in March. He testified, however, that he instructed her to follow the printed instructions exactly and that Feury has never taken more pain medication than indicated by the prescription. Member admitted that he never wrote Feury a prescription for Fentanyl and that the rules and regulations of the Department of Health prohibit a doctor from prescribing or administering medication to a family member unless in an emergency. He likened his actions to giving away sample drugs and said he had a conversation with Feury after he gave her the patches and told her not to use them. Member also testified that Fentanyl is not limited to the treatment of chronic terminal cancer patients.

At the conclusion of the evidence, the trial judge struck the second degree murder charge against Member. The jury then acquitted Member of involuntary manslaughter, convicted him of drug distribution, as an accommodation, and recommended a fine

of $2,500.  The trial judge entered the conviction order according to the jury's recommendation.

II.

"The court may direct that an accused be tried at one time for all offenses then pending against him, if justice does not require separate trials and . . . the offenses meet the requirements of Rule 3A:6(b)."  Rule 3A:10(c).  In pertinent part, Rule 3A:6(b) provides that "[t]wo or more offenses . . . may be charged . . . if the offenses are based on the same act or transactions, or on two or more acts or transactions that are connected or constitute parts of a common scheme or plan."  Applying these rules the Supreme Court has held that "[w]hether different offenses should be tried separately is a matter that rests within the sound discretion of a trial court," and the Supreme Court further held that "a trial court's ruling on the matter will not be reversed absent a showing that the court abused its discretion."  Cheng v. Commonwealth, 240 Va. 26, 33-34, 393 S.E.2d 599, 603 (1990).

Member "concedes that the evidence of the distribution of Fentanyl was essential to the trial of the homicide charges," but contends "the reverse . . . is not true."  Thus, he argues justice required a separate trial for the distribution charge. The trial judge found, however, that "the Commonwealth can, and in fact, may have to get into the facts that there is a person

- 7 -

who is dead in order to prove the distribution, under the peculiar facts of this case."

The record supports the trial judge's finding. The evidence proved the Fentanyl patches were on Feury's body at her death. Obviously, Feury could not testify concerning the source of the Fentanyl. No person other than Member was present when the distribution occurred. Thus, the Commonwealth's proof of the source of the Fentanyl was Member's admission to the detective. "[A]s a general principle of law, an accused cannot be convicted solely on his uncorroborated extrajudicial admission or confession." Watkins v. Commonwealth, 238 Va. 341, 348, 385 S.E.2d 50, 54 (1989). Moreover, as the Supreme Court has ruled, "[w]here a course of . . . conduct is . . . interwoven, . . . the perpetrator has no right to have the evidence 'sanitized' so as to deny the jury knowledge of all but the immediate crime for which he is on trial." Scott v. Commonwealth, 228 Va. 519, 526, 323 S.E.2d 572, 577 (1984).

The record established that the events were connected by the same transaction and, therefore, were sufficiently interwoven. Indeed, the presence of the patches on Feury's body was a circumstance that corroborated Member's admission that he gave her the drug. The trial judge did not err in concluding that the facts of this case established that Feury's death was a link in the proof of the distribution and that justice did not require separate trials.

III.

Member contends the trial judge erred in allowing the prosecutor to prove the Board of Medicine's rules and regulations prohibiting the dispensing of Schedule II drugs except by prescription.

On direct examination Pearson testified as follows:

> Q:  . . . Now, is Fentanyl always prescribed or is it sometimes given as a sample in line a doctor's office?
>
> A:  Never as a sample.  Always has to be prescribed.

Member objected and contended Pearson was not being asked to express an opinion on toxicology but rather about a legal issue. Specifically, Member argued that the prosecutor's question required Pearson to opine whether it is legal to give Fentanyl without prescription.  The trial judge sustained Member's objection.  The prosecutor then asked, "All right, so it's a drug that needs to be prescribed?," and the witness answered, "Yes."  When Member objected again, the trial judge noted that the witness had earlier testified "[w]ithout objection . . . that it's a [Schedule II] controlled substance . . . that must be prescribed by a physician."

Member waited until after Pearson completed her testimony to make a motion for mistrial.  The trial judge refused to declare a mistrial but cautioned the jury as follows:

> I wanted to caution you that the last witness that you heard on the stand, she

- 9 -

said a lot of things and, as I will tell you later in the trial, you certainly have the right to accept or reject those things for various reasons, but one thing that you need to understand and that is the legalities surrounding the distribution of what has been told to you -- called for you a schedule two controlled substance. The legalities of all that are issues of law that I will instruct you about it at the end of the case.

As the Supreme Court has noted "error arising from an improper question . . . may usually be cured by prompt and decisive action by the trial court without granting a motion for a mistrial." Black v. Commonwealth, 223 Va. 277, 286, 288 S.E.2d 449, 454 (1982). The record in this case does not show the contrary. Although Member did not make a timely motion for a mistrial, the trial judge cautioned the jury promptly after the motion. Because the record does not contain any contrary indications, we "presume[] that the jury followed an explicit cautionary instruction promptly given." LeVasseur v. Commonwealth, 225 Va. 564, 589, 304 S.E.2d 644, 657 (1983).

The record also indicates that when responding to a question about Schedule I and II drugs, Gwaltney-Garrison said "you have to have a written prescription" to obtain a Schedule II drug. The trial judge sustained Member's objection. The prosecutor also asked Gwaltney-Garrison whether the Board of Medicine has rules or guidelines concerning a doctor's dispensing of drugs. The trial judge sustained Member's objections to this question. Nevertheless, Member contends on

appeal that the comment and the question served to inject improper issues into the trial.

When the trial judge sustained the objection to Gwaltney-Garrison's testimony and to the prosecutor's question, this testimony ipso jure did not become a part of the evidence for the jury's consideration. "[T]he admissibility of testimony is decided by the judge's sustaining or overruling objections to questions." 1 J. Strong, McCormick on Evidence § 51, at 216 (5th ed. 1999). Furthermore, the trial judge had earlier cautioned the jury that he would instruct them at the end of the case concerning legalities of the distribution. Member did not ask for a further caution. We cannot say "there is a manifest probability that the evidence or statement has been prejudicial" to Member. Saunders v. Commonwealth, 218 Va. 294, 303, 237 S.E.2d 150, 156 (1977). The events he complains of were not admitted as evidence, and the trial judge cautioned the jury. Thus, we hold that Member's contention that the trial judge erred lacks merit.

IV.

In pertinent part, Code § 18.2-248(A) provides that "[e]xcept as authorized in the Drug Control Act (§ 54.1-3400 et. seq.), it shall be unlawful for any person to . . . give or distribute a controlled substance." Germane to this appeal, Code § 54.1-3408 provides that "[a] practitioner of medicine . . . shall only prescribe, dispense, or administer controlled

- 11 -

substances in good faith for medicinal or therapeutic purposes within the course of his professional practice."

"Where the sufficiency of the evidence is challenged after conviction, it is our duty to consider it in the light most favorable to the Commonwealth and give it all reasonable inferences fairly deducible therefrom." Higginbotham v. Commonwealth, 216 Va. 349, 352, 218 S.E.2d 534, 537 (1975). The evidence is undisputed that Member distributed the Fentanyl to Feury. The jury found that Member "distributed Fentanyl" and that as "a licensed practitioner of medicine, [he] did not dispense the controlled substance in good faith for medicinal or therapeutic purposes within the course of his professional practice." The evidence was sufficient for the jury to find beyond a reasonable doubt that Member was not Feury's physician, that he distributed the Fentanyl to her without instructions as to its use, and that he did not prescribe the Fentanyl within the course of his professional practice.

Accordingly, the evidence was sufficient to support the conviction.

Affirmed.