## Richmond.

### JONES v. COMMONWEALTH,
### AND
### PERKINS v. COMMONWEALTH.

January 12, 1911.

Absent, Cardwell, J.

1. CRIMINAL LAW—*Change of Venue—Jurors from Another County—Cases at Bar.*—Where an application for a change of venue is based simply on the ground of difficulty in obtaining jurors in the county free from exception, it must be preceded by an application to summon jurors from beyond such county, but this rule has no application where the motion for a change of venue is based upon the ground that there exists such prejudice and excitement against the accused as to endanger the fairness and impartiality of a trial conducted in the county. In the cases at bar, the state of feeling against the accused in the county in which the alleged offense was committed was such that it was error to refuse the motion for a change of venue.

2. CRIMINAL LAW—*Testimony of Accomplices—Impeachment—Influences.*—Any evidence tending to shed light upon the evidence of accomplices, or to affect their credibility, or the weight to which their testimony is entitled, by showing what influences, if any, have been brought to bear upon them is plainly admissible. If an accomplice has been promised immunity from prosecution, the jury are entitled to know it.

3. CRIMINAL LAW—*Testimony of Accomplices—Corroboration.*—While the jury may, if they see proper to do so, convict upon the uncorroborated testimony of an accomplice alone, it is the duty of the court to warn them not to do so. As to the extent of the corroboration, the general rule, and the one which is correct and safe, is that if two or more accomplices are produced as witnesses, they are not deemed to corroborate each other, but the same rule is applied, and the same confirmation is required, as if there were but one. Moreover, the corroboration or confirmation must relate to some fact (or facts) which goes to establish the *guilt* of the accused.

Error to a judgment of the Circuit Court of Buckingham county.

*Reversed.*

The opinion states the case.

*A. S. Hall* and *A. E. Strode*, for the plaintiffs in error.

*Samuel W. Williams, Attorney General*, for the Commonwealth.

Whittle, J., delivered the opinion of the court.

These are companion cases. They arose out of the same transaction, are dependent substantially upon the same evidence, the assignments of error are common to both, and, therefore, they may be disposed of in one opinion.

On the night of April 17, 1909, a log cabin situated in Buckingham county, owned and occupied by two elderly batchelor brothers, T. C. Stuart and W. J. Stuart, was entirely destroyed by fire. The fire was discovered early the next morning, and when the neighbors appeared on the scene they found in the still burning building the partially consumed trunks of two human bodies which were identified with reasonable certainty as the remains of the Stuart brothers. The smaller of the two skeletons, answering in size to that of W. J. Stuart, was lying near the fire-place; and a physician who examined fragments of the skull discovered a number of leaden pellets embedded in the inside of the parietal bone taken from the left side of the skull, which he identified as shot. The witness also testified that the passage of those shot from one side of a human skull to the other would cause instant death. The remains of the other brother were found in a corner of the room with the head missing and the

neck smooth as though the head had been severed from the body.

The Stuarts were reputed to have had money, and it was generally believed throughout the county that they were murdered and robbed and their home burned to conceal the crime. The community was naturally deeply aroused by the suspicion that a dreadful crime had been perpetrated in their midst, and active efforts were put forth to ascertain the guilty agents. To that end the Governor of the State and the board of supervisors of the county offered. rewards, aggregating $600, for each person convicted of the offense. Nevertheless, it was not until some two months had elapsed after the fire that Willie Jackson, a negro boy about seventeen years of age, implicated W. Dallas Wright, a white man, and the plaintiffs in error, Jones and Perkins, negroes, as the perpetrators of the triple crime of murder, robbery and arson. Jackson professed to have been an eye-witness to the tragedy, and upon his testimony a grand jury of the Circuit Court of Buckingham county, at the July term, 1909, returned a joint indictment against the three parties, charging them with the murder of the Stuarts; whereupon, each of them elected to be tried separately.

Wright and Jones were twice put on trial. The first trials were had before his honor, Judge B. T. Gordon, who was at that time judge of the circuit court. The jury failed to agree in Wright's case. Jones was found guilty of murder in the first degree, but the court set aside the verdict as contrary to the law and evidence. In an able opinion, Judge Gordon, after a searching review of the testimony of the alleged eye-witnesses, Willie Jackson and Aylett Johnson, characterized their statements as so incredible as to challenge human belief.

Before the next term of the court, the county of Buckingham became a part of his honor, Judge George J. Hundley's circuit, who presided at subsequent trials of the accused. A verdict of guilty of murder in the first degree was found in

each case, which the court refused to set aside, and rendered the judgments which are now before us for review.

The first assignment of error involves the action of the court in overruling the motion for a change of venue.

The motion was founded upon the allegation that public opinion was so strong against the accused that they could not get a fair and impartial trial in Buckingham county. A number of witnesses were examined, many of whom it is true expressed the opinion that the prisoners could have a fair and impartial trial in the county; yet, on cross-examination, these same witnesses practically without exception admitted that the belief was almost universal throughout the community that the accused were guilty. It was also shown, that before these prosecutions were set on foot a deputy sheriff, accompanied by his son, went to the home of Richard Perkins in the night time, and arousing him out of bed arrested him for the murder of the Stuarts. The officer pretended to be acting under a warrant, but no such paper was produced, and the fact of its existence was not established. The prisoner, who was neither handcuffed nor tied, willingly accompanied the parties, both of whom were on horseback while he was afoot; and within three hundred yards from his house he was set upon by a mob of armed men, who took him from the custody of the deputy sheriff, and putting a rope around his neck repeatedly drew him up over the limb of a tree for the purpose of extorting a confession. Facing what must have appeared to him immediate death at the hands of these lawless people, he stoutly proclaimed his innocence, denying either complicity in or any knowledge of the perpetrators of the crime. The mob then delivered him to the officer, who, after conveying him a mile away from the scene, discharged him, with the injunction that he must come to the court-house next day, which he did.

It is not possible to read the evidence bearing upon this episode without being satisfied that the deputy sheriff con-

nived at this partial lynching of his prisoner. It also appears that other citizens of the county, occupying responsible official positions, if not actual participants in the outrage were at least so closely associated with it that they refused to testify on the subject lest their evidence might tend to incriminate them.

The accused also introduced two editorials from a newspaper published in the county, which appeared pending the prosecutions. These publications were couched in language so intemperate as to be well calculated to further inflame public sentiment. The following paragraph will show the character of the articles:

"We trust that the people of Buckingham will demand the punishment of red-handed fire-brands and bloody criminals and refuse to let money, spent in hiring tricksters, unlock all our jail doors and turn loose all our dangerous men."

In the state of feeling which evidently existed throughout the community against the accused, the situation would not have been relieved by importing a jury from another county, for it is reasonable to assume that they would have yielded, to some extent at least, to the influence of local prejudice. Cases sometimes arise (and the cases in judgment are of that class) when in order to obtain a dispassionate and impartial hearing, it is as essential to change the theatre of trial as to have a jury filling the requirements of the law. The legislature, realizing the possibility of such a situation, has invested the courts with power to change the venue, either upon the motion of the accused or of the attorney for the Commonwealth, or without such motion for good cause. Virginia Code, 1904, sec. 4036, (amended Acts 1904, p. 307); *Wormsley's Case,* 10 Gratt. 673; *Uzzle's Case,* 107 Va. 919, 60 S. E. 52.

In *Uzzle's Case,* the court, at p. 926 of 107 Va. and p. 54 of 60 S. E., said: "It is well settled that, where an application for a change of venue is based simply on the ground of difficulty in obtaining jurors in the county or corporation free

from exception, it must be preceded by an application to summon jurors beyond such county. *Wright's Case*, 33 Gratt. 880; *Joyce's Case*, 78 Va. 287. But where the application for a change of venue is based upon the ground that there exists such prejudice and excitement against the accused as to endanger the fairness and impartiality of a trial conducted in the county, then the rule of practice invoked by the Attorney General does not and ought not to apply."

These cases come fully within the rule announced in the above case, and the trial court erred in overruling the motion for a change of venue.

The next assignment of error is to the ruling of the court in excluding from the consideration of the jury the testimony of the sheriff of the county, by which it was sought to prove that the Commonwealth's attorney had stated in the presence and hearing of Willie Jackson (who was about to be sent before the grand jury as a witness against the accused) that he would never ask a jury of Buckingham county to convict him upon his testimony.

In considering the relevancy and materiality of that testimony it must be observed that the only direct evidence tending to connect the prisoners with the commission of the crime was that of Willie Jackson and Aylett Johnson. Without their evidence the conviction of the accused would have been impossible, and according to their own admissions they were placed to watch while they say Wright, Jones and Perkins committed the deed. In other words, their version of the affair tended to show that they were accomplices (though they claimed to have acted under coercion) ; consequently any evidence tending to shed light upon their statements, or to affect their credibility, or the weight to which their testimony was entitled, by showing what influences, if any, were brought to bear upon them or either of them was plainly admissible. *Parsons* v. *Harper*, 16 Gratt. 64, 74; *Schaubuch* v. *Dillemuth*,

108 Va. 86, 90, 60 S. E. 745. If such was the fact, the jury were entitled to know that the chief witness, Jackson, had been promised immunity from prosecution.

The remaining assignment of error which we deem it necessary to consider is to the refusal of the court to instruct the jury, "That the testimony of one accomplice cannot be considered as being corroborated by the agreeing testimony of another accomplice."

While the rule of decision in this jurisdiction is that the jury, as triers of fact, may, if they see proper to do so, convict upon the uncorroborated testimony of an accomplice alone, nevertheless, the principle is well settled that the evidence of an accomplice must be received and acted upon by the jury with great caution. The source of such evidence is tainted, and the danger of collusion between accomplices and the temptation to exculpate themselves by fixing responsibility upon others is so strong, that it is the duty of the court to warn the jury against the danger of convicting upon their uncorroborated testimony. From these considerations, the generally accepted rule is, that "If two or more accomplices are produced as witnesses, they are not deemed to corroborate each other, but the same rule is applied, and the same confirmation is required, as if there were but one." 1 Greenleaf on Ev. (15 ed.), sec. 381; *Woods* v. *Commonwealth*, 86 Va. 929, 931, 11 S. E. 798; *Byrd* v. *Commonwealth*, 2 Va. Cas. 490, 493; 1 Am. & Eng.. Enc. L. (3nd ed.), p. 405; *McConnel* v. *State*, (Tex. App.), 18 S. W. 645; *Howard* v. *Com'th*, 110 Ky. 356, 61 S. W. 756; *U. S.* v. *Logan* (C. C.), 45 Fed. 872; *People* v. *Greegan*, 121 Cal. 554, 53 Pac. 1082; *People* v. *O'Farrell*, 175 N. Y. 323, 67 N. E. 588.

It is true some of the above citations are from jurisdictions where, by statute, a conviction cannot be had upon the testimony of an accomplice alone; still we believe the correct and safe rule is to require that corroboration shall come from a

source other than another accomplice. Moreover, the corroboration or confirmation must relate to some fact (or facts) which goes to establish *the guilt* of the accused. 3 Russell Law of Crimes (7th Eng. ed. and 1st Canadian ed.), 2288, n; 1 Am. & Eng. Enc. L. (2nd ed.) 405, n.

As the judgments must, for these errors, be reversed and the cases remanded for a new trial, it is not necessary, nor perhaps proper, to pass upon the assignment questioning the sufficiency of the evidence to warrant convictions.

*Reversed.*