## Richmond

JOHN EARLY DILLARD v. COMMONWEALTH OF VIRGINIA.

April 23, 1976.

Record No. 751000.

Present, All the Justices.

*John L. Gregory, III; Benjamin R. Gardner (Young, Kiser, Haskins & Mann, Ltd.; Frith, Gardner & Gardner,* on brief), for plaintiff in error.

*Alan Katz, Assistant Attorney General (Andrew P. Miller, Attorney General,* on brief), for defendant in error.

Carrico, J., delivered the opinion of the court.

The sole question for decision in this criminal appeal is whether the trial court erred in refusing defense Instructions B and C, relating to the corroboration of the testimony of an accomplice. The instructions were refused in the trial of the defendant, John Early Dillard, on charges of murder, conspiracy to rob, and robbery. The defendant was convicted by the jury of the charges, and his punishment was fixed at a total of 35 years confinement in the penitentiary. He was sentenced in accordance with the jury's verdict, and he now seeks reversal.

The record shows that on the evening of November 15, 1974, police officers found John Futrell, wounded and bleeding, on the front seat of his taxicab in Bassett, Henry County. He had been shot three times, and he died of a gunshot wound of the head, caused by a .22 calibre bullet.

Israel Gilbert, who implicated himself in the crimes, testified for the Commonwealth that the defendant had shot and robbed Futrell. Asserting that Gilbert's testimony was not sufficiently corroborated, the defendant contends that the trial court erred in refusing his tendered Instruction B.[1]

In Virginia, the jury, if satisfied of guilt, may convict an accused upon the uncorroborated testimony of an accomplice. *Blount* v. *Commonwealth*, 213 Va. 807, 810, 195 S.E.2d 693, 695 (1973). Where accomplice testimony is uncorroborated, however, it is the duty of the court to warn the jury against the danger of convicting upon such uncorroborated testimony. *Jones* v. *Commonwealth*, 111 Va. 862, 868, 69 S.E. 953, 955 (1911). This warning is required because the source of accomplice testimony is tainted with the temptation to exculpate oneself by laying the crime upon another. *Largin* v. *Commonwealth*, 215 Va. 318, 319, 208 S.E.2d 775, 776 (1974).

But where accomplice testimony is corroborated, it is not error to refuse a cautionary instruction. *Clinton* v. *Commonwealth*, 204 Va. 275, 283, 130 S.E.2d 437, 443 (1963), rev'd on other grounds, 377 U.S. 158 (1964). Indeed, while this court has repeatedly stated the

[1] "THE COURT INSTRUCTS THE JURY that under the testimony given by Israel Gilbert in this case he was an accomplice in the commission of the offense charged in the indictment, and while the jury may found its verdict upon the uncorroborated testimony of an accomplice, it is the duty of the jury to receive such testimony with great care and caution, and the Court warns the jury of the danger of convicting the defendant upon the uncorroborated testimony of an accomplice."

principle that a jury should be warned to accept uncorroborated accomplice testimony with "great care and caution," our research has not disclosed a single instance where a conviction was reversed because of failure to grant a cautionary instruction.[2] Just as consistently, where we have found corroboration, we have held it not reversible error to refuse a cautionary instruction. *See, e.g., Richards v. Commonwealth,* 187 Va. 1, 4, 46 S.E.2d 1, 2 (1948).

With the usual instruction, the test in determining whether it should be granted is: does the evidence support the instruction? Cautionary accomplice instructions, however, deal with a lack of evidence, evidence of a corroborative nature. The test, therefore, in determining whether a cautionary instruction should be granted becomes this: is corroborative evidence lacking? If it is, the instruction should be granted; if it is not lacking, the instruction should be refused, because to warn a jury against accepting uncorroborated testimony is to indicate that the court does not consider the testimony corroborated.

██ It is clear, therefore, that cautionary instructions should be granted when accomplice testimony is uncorroborated and that they should be refused when such testimony is corroborated. What is unclear, however, the defendant says, is the quantity and quality of corroborative evidence necessary to justify refusal of cautionary instructions. The corroborative evidence, the defendant contends, must measure up to the standard set forth in his refused Instruction C,[3] *viz.,* the corroboration must constitute independent evidence which supports the *ultimate fact* that the accused committed the offense charged. We do not agree that this is the proper standard or that, in any event, the jury should be instructed with respect to the standard.

The "ultimate fact" standard was contained in an instruction granted by the trial court, at the request of the accused, in *Benson v. Commonwealth,* 190 Va. 744, 58 S.E.2d 312 (1950). The instruction, however, was not in issue on appeal and, indeed, its content may be found only by resort to the record. In answering a contention of the accused that certain other instructions had been improperly refused, we said, "It appears from the instructions granted that the jury was

---

[2] In one case, we held it reversible error to refuse to instruct the jury that the testimony of one accomplice was insufficient to corroborate the testimony of another accomplice. *Jones v. Commonwealth, supra,* 111 Va. 862, 69 S.E. 953.

[3] "THE COURT INSTRUCTS THE JURY that in order for other testimony to amount to corroboration of the testimony of Israel Gilbert there must be independent evidence which supports the alleged ultimate fact that the defendant committed the offenses charged."

fairly instructed on the issues involved, and that those offered by the defendant were properly refused." 190 Va. at 754, 58 S.E.2d at 316. This did not amount to approval by this court of the "ultimate fact" standard or to a holding that the jury should be instructed with respect to whatever standard is applicable.

The defendant argues that we did adopt the rigid "ultimate fact" standard in *Jones* v. *Commonwealth, supra*, 111 Va. at 869, 69 S.E. at 955, when we said, "[T]he corroboration or confirmation must relate to some fact (or facts) which goes to establish *the guilt* of the accused." We believe this is the proper standard, but it is not as rigid as the "ultimate fact" test. The corroborative evidence, standing alone, need not be sufficient either to support a conviction or to establish all the essential elements of an offense. If those were the requirements, and the Commonwealth had at hand independent evidence sufficient to satisfy them, then the need to use accomplice testimony would not arise.

What is required to satisfy the "relation to guilt" standard, enunciated in *Jones*, was demonstrated in *Crosby* v. *Commonwealth*, 132 Va. 518, 110 S.E. 270 (1922). There, the accused was charged with illegal sale of intoxicating liquor. He denied the sale. An accomplice, the purchaser of the liquor, testified for the Commonwealth that the accused had made the sale. The only other evidence was produced by a police officer, who testified he saw the accused at the window of the house where the sale was alleged to have occurred; observed the accused look up and down the street; noticed the alleged purchaser enter the house; and afterwards found whiskey in the possession of the purchaser. After reciting these facts, the opinion states:

"[S]o . . . the occasion and opportunity for the crime as well as the possession [by the purchaser] of the whiskey alleged to have been purchased were all clearly shown. This, then, is not a case in which the accused has been convicted upon the uncorroborated testimony of his accomplice." 132 Va. at 520, 110 S.E. at 271.

We held it was not error for the trial court to refuse to instruct the jury to receive with caution the testimony of the accomplice.

Where, therefore, the testimony of an accomplice is corroborated in material facts which tend to connect the accused with the crime, sufficient to warrant the jury in crediting the truth of the accomplice's testimony, it is not error to refuse a cautionary instruction. This rule applies even though the corroborative evidence falls short of constitut-

ing "independent evidence which supports the alleged ultimate fact" that the accused committed the offense charged.

In the present case, Instruction C, tendered by the defendant, contained the improper "ultimate fact" standard. This, alone, would be sufficient to sustain the trial court's refusal of the instruction. We do not believe, however, that *any* instruction relating to standard should have been granted. In this area of the law, a legal standard enunciated by this court is for the guidance of the trial courts in determining whether accomplice testimony has or has not been sufficiently corroborated to warrant, as the case may be, refusing or granting a cautionary instruction warning the jury to accept uncorroborated accomplice testimony with "great care and caution." Whether the standard has been met is a legal question for the court, not a factual question for the jury. Here, Instruction C would have permitted the jury to determine the legal question. For this additional reason, therefore, the trial court did not err in refusing Instruction C.

Whether, however, Instruction B, containing the "great care and caution" warning, should have been granted depends, in turn, upon whether the testimony of the defendant's accomplice, Israel Gilbert, was sufficiently corroborated. Resolution of this question requires analysis of the evidence upon which the trial court acted in refusing the instruction.

According to the testimony of the accomplice, Israel Gilbert, on the afternoon of November 15, 1974, he met the defendant at the latter's home in Bassett, where they discussed "getting some cash, cash money." The defendant said that "all he needed was a . . . gun." He inquired if Gilbert knew where he "could get a gun at." Gilbert stated that he "would see if [he] could find one."

Gilbert looked up an acquaintance, Kenneth Turner, because he knew Turner "always carry a gun." Finding Turner, Gilbert borrowed from him a .22 calibre "Clerk" pistol. Turner corroborated the loan transaction involving the gun.

According to his further testimonial statement, Gilbert returned to the defendant's home and showed him the borrowed weapon. After examining and approving the gun, the defendant returned it to Gilbert.

Later in the afternoon, Gilbert and the defendant went to the home of J. B. Mann, where they "played some cards." They stayed at the Mann residence until "it started getting dark." Mann corroborated the

presence together at his home of Gilbert and the defendant and their departure when "it was sort of dusk, dusk-dark."

Gilbert testified further that, after leaving the Mann residence, he and the defendant went to the latter's home. From there, they "caught a ride" with James Pace to a drugstore in Bassett. Pace corroborated his transportation of the pair to the drugstore.

According to Gilbert, on the street in front of the drugstore, he and the defendant "started talking about robbing a cab." Gilbert crossed the street and waited "on the bridge" while the defendant went "on down the street and got inside the cab." Weldon Hall, a fellow cab driver, corroborated the fact that Futrell, who later was murdered, left the cab stand with only one passenger, seated in the rear.

Under Gilbert's version, when the cab reached his position, it stopped and the defendant asked him if he wanted a ride. Gilbert joined the defendant on the rear seat. The defendant instructed Futrell to proceed to "Cat's place." En route, the defendant "tapped [Gilbert] on the leg . . . for [Gilbert] to pass the gun to him." Gilbert "passed the gun" to the defendant.

Upon arrival at "Cat's place," the taxicab was backed into a driveway and Futrell turned on the interior light. The defendant "put the gun to" the back of Futrell's head and said, "OK." Futrell "got his hand around," and the defendant started shooting, firing two or three times. Gilbert and the defendant alighted from the cab, and the latter "reached in and turned off the light." The defendant went "across the street" and Gilbert "went up the street." As he was "going up the street," Gilbert saw an acquaintance, Frank Helms.

Martha Penn, a resident of a house apparently across the street from "Cat's place," testified that she saw the "cabdriver pull up . . . cut the lights off," and "reach back for to get some money." She then heard shots, and she saw two men alight from the rear of the cab and run away. One "went up the road" and the other "went down behind the house." Frank Helms, also a resident of the area, testified that he was returning home from a grocery store when he saw "a cab pull up . . . heard approximately three shots fired," and saw "a tall person jump out [the right side of] the cab" and run "out the road."

Gilbert, according to his statement, made his way to an establishment known as the "Honey Hole." There, he encountered Kenneth Turner, from whom he had borrowed the gun. He told Turner that the defendant had shot and robbed Futrell. When Turner learned his gun had been used in the crimes, he became upset and decided that he

and Gilbert should find the defendant and retrieve the gun. Turner corroborated his conversation with Gilbert at the "Honey Hole."

Continuing with Gilbert's testimony, he stated that he and Turner paid Obediah Niblett $1.00 to transport them in his car to find the defendant. After an unsuccessful search for the defendant, Gilbert, Turner, and Niblett returned to the "Honey Hole." Turner and Niblett corroborated this portion of Gilbert's testimony.

Sometime later in the evening, so Gilbert testified, Loretta Turner, his girlfriend, came into the "Honey Hole" and advised him that the defendant was outside and wanted to see him. Gilbert went outside and had a conversation with the defendant. This part of Gilbert's story was corroborated by Loretta Turner.

Gilbert further testified that in the conversation outside the "Honey Hole," the defendant told him he had taken $8.00 from Futrell, and the defendant gave Gilbert $2.00 as his share. The defendant also told Gilbert that when Futrell "turned around . . . he had a gun inside his hand and he . . . shot [Futrell] in the head." Gilbert secured Turner's gun from the defendant. Gilbert called Turner outside and turned the weapon over to him. Turner corroborated the fact that Gilbert returned the gun to him.

The defendant's statement to Gilbert that Futrell "had a gun inside his hand" was corroborated by the police discovery on the taxicab's rear floorboard of a pistol identified as having belonged to Futrell. And important corroborative evidence was also found on the jacket worn by the defendant on the night of Futrell's murder. The jacket was splattered with blood matching Futrell's blood type. Tests showed the defendant also had the same type blood. But although he testified in his own behalf, denying he was even in Bassett on the night of the murder, the defendant offered no explanation of the presence of the blood on his jacket.

We hold that, all in all, the accomplice testimony of Gilbert was corroborated in so much of its material facts which tended to connect the defendant with the crimes charged that the jury was warranted in crediting the truth of the testimony. It was not error, therefore, for the trial court to refuse the defendant's tendered cautionary Instruction B, and the court's judgment of conviction will be affirmed.

*Affirmed.*