COURT OF APPEALS OF VIRGINIA

Present:   Chief Judge Fitzpatrick, Judges Bumgardner and Frank
Argued at Salem, Virginia


BARNEY JOHNSON
                                                        OPINION BY
v.        Record No. 1462-00-3                  JUDGE ROBERT P. FRANK
                                                     DECEMBER 23, 2003
COMMONWEALTH OF VIRGINIA


FROM THE CIRCUIT COURT OF RUSSELL COUNTY
Donald A. McGlothlin, Jr., Judge

David B. Hargett (Hargett & Watson, on brief), for appellant.

Josephine F. Whalen, Assistant Attorney General (Jerry W. Kilgore,
Attorney General; H. Elizabeth Shaffer, Assistant Attorney General,
on brief), for appellee.


Barney Johnson (appellant) was convicted by a jury of two counts of distributing

morphine, in violation of Code § 18.2-248, and one count of conspiracy to distribute morphine,

in violation of Code § 18.2-256.  On appeal, he contends the trial court erred in denying a

cautionary instruction on the uncorroborated testimony of an accomplice.  We find the

accomplice's testimony was corroborated, thus we affirm the convictions.

BACKGROUND

Bonnie Gay Ray was a drug addict.  In June of 1996, she had a conversation with

appellant, who told her "he had some morphine to get rid of."  Ray agreed to help appellant sell

the drugs.  Appellant explained he wanted $35 per pill and instructed Ray to get the money from

buyers "up front."  He said she could charge "a little bit more" than $35 to make a profit for

herself.[1]  Appellant also explained that Ray should call him when she had a buyer.  She then

_____

[1] She charged $40 per pill.

could come to his house on Big A Mountain. If she had no vehicle, he would pick her up. They agreed on three potential places for meetings. Once she called him and told him how many "grapes" (the street slang for morphine pills) she needed, they would agree on a meeting place. Appellant would say nothing when they met.

Ray explained at trial that, while she was getting the drugs from appellant, the buyer would wait for her somewhere in town because appellant insisted that the buyer "wasn't close by" when they met. Ray frequently met appellant in front of the old Puff and Snuff store in Honaker. This arrangement between them continued until Ray was incarcerated on August 25, 1999. She averaged about 50 sales per month.

Ray knew Steve Ball through their prior drug dealings. Ray testified that in the evening on May 31, 1998, Steve and Judy Ball talked to her in her driveway and asked if she had any "grapes" to sell. She told them that it was too late for her to obtain the drugs that night, asking Steve to "get up with me the next day." He asked her, "what about BJ's," referring to appellant. Ray replied, "it's too late of the night to go get any."

The next morning, Ray and her daughter, Patricia, met Steve and Judy at "the old Puff and Snuff." While Ray was on the phone with appellant discussing a different drug transaction, Patricia walked over to talk with the Balls, who indicated they still wanted morphine. Patricia demanded the money "up front," and Steve gave her cash for two morphine pills. Patricia then walked over to her mother, who had finished her telephone conversation with appellant. Ray said she needed a dime to call appellant again, and the Balls gave a dime to Patricia. Ray again telephoned appellant to tell him that she needed additional pills. Appellant told her he would be there in "a few minutes." Ray then told the Balls to meet her at the post office. She and Patricia waited for appellant at Puff and Snuff.

Appellant arrived in his blue S-10 pickup truck, picked up Ray and Patricia in front of the old Puff and Snuff, and they drove off towards the Coastal Mart. Ray gave appellant $350, and appellant gave her ten morphine pills. Appellant then drove Ray and her daughter to the Wicker Manna parking lot, dropped them off, and left. Ray gave the morphine pills to the Balls, who were waiting for her in front of the post office. Ray then saw appellant drive back in the direction of Big A Mountain.

On the evening of June 3, 1998, the Balls again went to Ray's home asking for morphine. Ray replied she would have to make a telephone call and asked the Balls to drive her to a telephone. The Balls drove her to the Wicker Manna where Ray called appellant. He did not answer his telephone. Ray returned to the car, waited a few minutes, and called appellant again. When he answered, she asked him for two morphine tablets. He said he would be there in fifteen or twenty minutes and instructed her to wait at the Little General, a gas station/convenience store. Ray went to that location with the Balls. Steve handed Ray a $100 bill and asked for two morphine pills.

Ray waited for appellant while the Balls were "cruising back and forth." Appellant arrived at the Little General fifteen to twenty minutes after the call. He drove through the area for pumping gas, picked up Ray, and then drove towards Big A Mountain. Again, appellant drove the same blue pickup truck. They drove "all the way around until he brought [her] back down in town." Ray got out of the truck at the Little General store and watched appellant drive off in the direction of Big A Mountain, towards his home.

Ray waited in front of a bank until the Balls arrived. She got into their car and was about to hand Steve two morphine tablets in a napkin, when Steve asked her to put them in cellophane

- 3 -

instead of the napkin, which she did. Ray also gave Steve $20 in change from his purchase. The Balls then took her home.

Steve testified he was working as a confidential informant for the Russell County Sheriff's Department in the spring of 1998. He knew Ray because he had bought drugs from her in the past. On the evening of May 31, 1998, under the supervision of Investigator Watson of the Russell County Sheriff's Department, he drove to Ray's parents' home. She walked to his car, and Steve asked her whether she had any morphine. Ray indicated it was too late to get the drug, and that "BJ," referring to appellant, had already gone to bed.

The next day, Steve and his wife met Investigators Watson and Wolfe. The police searched them, debriefed them, provided them with four $20 bills to purchase the drugs, and gave them an audiocassette recorder to record the transaction. The Balls then left the staging area with the two officers following them. They drove to the Puff and Snuff, where they saw Ray using the telephone. Her daughter, Patricia, walked over to Steve's window, asked if he was "still looking," and then asked for the money "up front." Steve gave her four $20 bills for two pills. Ray told him to drive to the post office parking lot. As he started to leave, Patricia said she needed a dime to make a phone call, and Steve gave her the coin. Steve saw Ray make another telephone call. He then drove to the post office.

Steve testified that, after they left the Puff and Snuff, he saw appellant drive up to the Puff and Snuff in a dark blue S-10 Chevrolet pickup truck with a red door on the driver's side. He came south on Route 80 from the Big A Mountain area, picked up both women, and then drove south towards the Coastal Mart. They returned and drove into the Wicker Manna parking lot. The women got out, and appellant drove off in the direction of Big A Mountain. Ray and Patricia then approached the Balls' car. Ray handed Steve two morphine tablets, and he and his wife left. The Balls drove to the staging location, where Steve gave the morphine, the cassette

recorder, and the tape of the transaction to the police officers. The officers searched Steve, his wife, and the car again.

On the evening of June 3, 1998, the Balls again met with Investigators Watson and Wolfe at the same staging area and were again searched, as was their car. They were given a tape, a cassette recorder, and a $100 bill. The Balls then drove to Ray's home and told Ray that they wanted two "grapes." She said they would have to give her a ride into town to make a telephone call. They drove Ray to a pay telephone at the old Puff and Snuff. She called appellant, but got no answer. They then drove through town looking for appellant. They returned to Puff and Snuff where Ray again telephoned appellant. This time he answered his telephone and told Ray to wait fifteen or twenty minutes for him to arrive. Ray then asked the Balls to drop her off at the Little General Store. Steve gave Ray the $100 bill.

Approximately ten or fifteen minutes later, the Balls saw appellant drive up in the same blue pickup truck. He came from the direction of Big A Mountain. He circled around the gas tanks, stopped, and Ray got into his truck. The Balls continued to drive around town. When they saw Ray again, she was in the bank parking lot. The Balls stopped their car, and Ray got in. She handed Steve two morphine pills wrapped in a napkin. Steve asked her to put them in a cellophane pack, which she did, and Steve placed them in his pocket. Ray gave Steve $20, and then the Balls drove her home. After that, the Balls returned to the staging area and gave the officers the pills, the money, and the recording. The officers searched the Balls and their car again, and they left.

The tape recordings made on June 1 and June 3 by Steve were played for the jury.

Lieutenant William Watson was a narcotics investigator for the Russell County Sheriff's Office. He testified that, in the spring of 1998, Steve Ball agreed to work as a confidential informant with the sheriff's office. On May 31, 1998, Lieutenant Watson and Officer Wolfe met

the Balls at a staging area. After Officer Wolfe searched the Balls and their car, Watson gave them a small recorder and money to buy drugs. The police then followed the Balls as they drove to Ray's parents' home. The Balls returned to the staging area, having been unable to purchase drugs.

The next day, Watson and Wolfe again met with the Balls at the same staging location. After the same search procedure, they gave Steve four $20 bills and a cassette recorder. Watson and Wolfe then followed the Balls as they drove to the Puff and Snuff. Watson saw Ray and Patricia near a pay phone. He then saw Patricia approach the Balls' car. The officers saw her walk away from the car and back to Ray at the pay telephone. Patricia approached the Balls' car again. Watson then saw the Balls drive over to the post office parking lot while Ray and Patricia remained near the pay phone.

A short time later, Watson saw a blue S-10 pickup truck with a red door, coming from the direction of Big A Mountain, drive into the parking lot near the pay telephone. Appellant was driving. Ray and Patricia got into the truck, and it drove away. A few minutes later, Watson saw the truck and the same three occupants return and drive into the parking lot of the Wicker Manna restaurant. Ray and her daughter exited appellant's truck. He then drove back toward Big A Mountain.

Watson then saw Ray approach the Balls' vehicle. Ray reached inside the car window "as if handing something to" Steve. Watson then saw Ray and Patricia walk back towards the pay phone. The Balls left and returned to the staging area. Once there, Steve handed Watson "some small tablets," the cassette recorder, and the tape.

On the evening of June 3, 1998, Investigator Watson met with the Balls at the same staging area. After the Balls and their vehicle were searched, Watson gave Steve a $100 bill and a recording device. The Balls then drove to Ray's residence as the officers followed them. The

officers watched the Balls drive up the road to Ray's residence. A few minutes later, Watson saw them drive back past the officers and drive to the pay phone in front of the Puff and Snuff. Ray exited the Balls' car and made a telephone call. Watson saw Ray get back into the Balls' car. The Balls and Ray drove towards Big A Mountain, but stopped in a parking lot near the Little General. Ray exited the car. Watson saw the Balls driving back and forth through the town after they left Ray in the parking lot.

Twenty-three minutes later, appellant arrived at the Little General store in the same blue pickup truck. Ray entered appellant's truck. Appellant then drove toward Big A Mountain. About two minutes later, Watson saw the truck return. Appellant dropped Ray off and drove back toward Big A Mountain. Ray then walked down the street just beyond the Little General. The Balls approached her, and Ray got into their car.

The Balls' car returned to the staging area, without Ray. The Balls and their vehicle were searched. Steve handed Watson two morphine tablets and the cassette recorder.

Investigator Wolfe's testimony was substantially the same as Officer Watson's. Neither officer observed appellant give drugs to Ray.

During his testimony at trial, appellant denied seeing Ray in June of 1998. He also denied any agreement with Ray to sell drugs. He claimed Ray and her daughter were not in his truck during June of 1998. He testified he was "set up" by the police, the Balls, and Ray. While admitting he owned a 1991 S-10 blue pickup truck, he denied the truck had a red door in June of 1998.

At the conclusion of the evidence, appellant offered an instruction advising the jury to consider Ray's uncorroborated testimony with great care. The instruction further cautioned the jury "as to the danger of convicting the defendant upon the uncorroborated testimony of an accomplice." After argument by counsel, the trial court refused the instruction, finding the

- 7 -

testimony of the two police officers and Steve Ball provided sufficient corroboration of Ray's testimony.

ANALYSIS

The sole issue on appeal is whether the additional evidence at trial provided sufficient corroboration of Ray's testimony. If Ray's testimony was sufficiently corroborated, then the trial court did not err in refusing the cautionary instruction offered by appellant. Appellant contends no evidence corroborated Ray's testimony that appellant conspired with her to sell morphine or that appellant gave the drugs to Ray. Essentially, appellant maintains no one saw Ray receive the drugs from appellant, thus, no independent evidence of the offenses was offered.

In Dillard v. Commonwealth, 216 Va. 820, 224 S.E.2d 137 (1976), Dillard argued the trial court should have granted an instruction on uncorroborated accomplice testimony. He claimed corroboration must constitute independent evidence, supporting the ultimate fact that the accused committed the offense. The Supreme Court explained:

> In Virginia, the jury, if satisfied of guilt, may convict an accused upon the uncorroborated testimony of an accomplice. Blount v. Commonwealth, 213 Va. 807, 810, 195 S.E.2d 693, 695 (1973). Where accomplice testimony is uncorroborated, however, it is the duty of the court to warn the jury against the danger of convicting upon such uncorroborated testimony. Jones v. Commonwealth, 111 Va. 862, 868, 69 S.E. 953, 955 (1911). This warning is required because the source of accomplice testimony is tainted with the temptation to exculpate oneself by laying the crime upon another. Largin v. Commonwealth, 215 Va. 318, 319, 208 S.E.2d 775, 776 (1974).
>
> But where accomplice testimony is corroborated, it is not error to refuse a cautionary instruction. Clinton v. Commonwealth, 204 Va. 275, 283, 130 S.E.2d 437, 443 (1963), rev'd on other grounds, 377 U.S. 158 (1964).
>
> \* \* \* \* \* \* \*
>
> With the usual instruction, the test in determining whether it should be granted is: does the evidence support the instruction? Cautionary accomplice instructions, however, deal with a lack of

evidence, evidence of a corroborative nature.  The test, therefore, in determining whether a cautionary instruction should be granted becomes this: is corroborative evidence lacking?  If it is, the instruction should be granted; if it is not lacking, the instruction should be refused, because to warn a jury against accepting uncorroborated testimony is to indicate that the court does not consider the testimony corroborated.

Id. at 821-22, 224 S.E.2d at 138-39.  The Court continued, explaining the standard for determining whether other evidence at trial corroborated an accomplice's testimony:

The defendant argues that we did adopt the rigid "ultimate fact" standard in Jones v. Commonwealth, *supra*, 111 Va. 862, 869, 69 S.E. at 955, when we said, "[T]he corroboration or confirmation must relate to some fact (or facts) which goes to establish *the guilt* of the accused."  We believe this is the proper standard, but it is not as rigid as the "ultimate fact" test.  The corroborative evidence, standing alone, need not be sufficient either to support a conviction or to establish all the essential elements of an offense.  If those were the requirements, and the Commonwealth had at hand independent evidence sufficient to satisfy them, then the need to use accomplice testimony would not arise.

Id. at 823, 224 S.E.2d at 139-40 (emphasis in original).

The facts in the instant case are very similar to those in Crosby v. Commonwealth, 132 Va. 518, 110 S.E. 270 (1922).  Crosby was charged with the illegal sale of liquor.  Id. at 519, 110 S.E. at 271.  The accomplice testified Crosby sold him the half-pint of whiskey that he possessed when he was arrested, moments after the purchase, for the unlawful transportation of illegal whiskey.  Id.  A police officer testified that he observed the accomplice enter Crosby's house, remain there for several minutes, and then walk down the street.  Id.  The officer also observed Crosby looking out the window just prior to the accomplice entering the house.  Id.  No one saw the accused sell the whiskey to the accomplice.  The Supreme Court found the accomplice's testimony was sufficiently corroborated by the officer's testimony.  Id. at 520, 110 S.E. at 271.

Richards v. Commonwealth, 187 Va. 1, 46 S.E.2d 1 (1948), is also instructive.  Richards, the owner of a restaurant, was charged with selling beer without a license.  The accomplice

- 9 -

testified he entered the restaurant and purchased eight bottles of beer from Richards.  Id. at 2, 46 S.E.2d at 1.  The accomplice then joined his companion, Mrs. Segar, in a cabin about thirty yards from the restaurant, bringing with him two bottles of beer.  Id.  Mrs. Segar testified the accomplice entered the restaurant without beer and "later he went from the restaurant to the cabin with the bottles of beer in his possession."  Id. at 4, 46 S.E.2d at 2.  Again, no evidence corroborated the specific fact that Richards sold beer to the accomplice.  The Supreme Court found, "The occasion and the opportunity for the crime, as well as the possession of the beer, were established by testimony other than that emanating from the alleged accomplice, hence the accused was not convicted upon the uncorroborated testimony of his accomplice."  Id.

Both Crosby and Richards illustrate that a trial court can refuse an instruction on uncorroborated accomplice testimony even in the absence of direct evidence of the essential element of an offense.  Thus, we must determine whether the corroboration of the two police officers and Ball "relate to some fact (or facts) which goes to establish the guilt of the accused." Dillard, 216 Va. at 823, 224 S.E.2d at 139-40 (emphasis omitted).  Stated differently, does such corroborative testimony "tend to connect the accused with the crime, sufficient to warrant the jury in crediting the truth of the accomplice's testimony."  Id. at 823, 224 S.E.2d at 140.  Here, we answer that question affirmatively.

First, we find the essential elements of the conspiracy charge were sufficiently corroborated.  The essential elements of conspiracy are clear:

> Virginia case law is replete with judicial analysis of what elements are necessary to constitute a conspiracy.
>
>> In order to convict the defendant of conspiring . . . to distribute a controlled drug, the Commonwealth had to prove beyond a reasonable doubt that an agreement existed between the two men by some concerted action to distribute the drugs.

Reed v. Commonwealth, 213 Va. 593, 594, 194 S.E.2d 746 (1973).

\* \* \* \* \* \* \*

Conspiracy is a crime that possesses both an *actus reus* and a *mens rea* element. Conspiracy requires:

> (1) an agreement between two or more persons, which constitutes the act; and (2) an intent to thereby achieve a certain objective which, under the common law definition, is the doing of either an unlawful act or a lawful act by unlawful means.

> W. LaFave & A. Scott, Criminal Law § 461 (1972). "The agreement is the essence of the conspiracy offense." Zuniga v. Commonwealth, 7 Va. App. 523, 527-28, 375 S.E.2d 381, 384 (1988).

Fortune v. Commonwealth, 12 Va. App. 643, 646-47, 406 S.E.2d 47, 48-49 (1991) (ellipsis in original).

Investigator Watson and Steve Ball corroborated Ray's testimony that a conspiracy to sell drugs existed between her and appellant. When Steve made a purchase of morphine, he had to pay "up front," a condition that Ray testified was imposed by appellant. Both Watson and Steve observed Ray making phone calls, and then appellant arriving to pick her up. Steve testified he had to drive around until Ray came back with the morphine, the procedure Ray testified appellant told her to follow. Ray would not sell the drug to Steve until she met with appellant. Both men observed appellant with Ray immediately prior to the two drug transactions. This evidence corroborated both that an agreement existed between at least two people and that those two people intended to distribute morphine.

The evidence also corroborated the distribution charges. "Code § 18.2-248 prohibits and makes unlawful the distribution of a controlled substance. See generally Andrews v. Commonwealth, 216 Va. 179, 182, 217 S.E.2d 812, 814 (1975) (stating that to establish distribution of a controlled substance, the Commonwealth must prove that the defendant knew

- 11 -

the nature and character of the materials he was charged with distributing).” Austin v. Commonwealth, 33 Va. App. 124, 129, 531 S.E.2d 637, 639 (2000). The evidence here was sufficient to corroborate Ray's testimony that appellant distributed controlled drugs.

The following facts regarding the June 1 sale were corroborated by evidence at trial: the locations where the distribution occurred; the two phone calls; the amount of money paid "up front"; appellant picking up Ray and delivering her back to Wicker Manna; the description of appellant's vehicle; Patricia's participation; the tablets given to Steve were morphine; and the direction of appellant's travel. Essentially, the police and Steve corroborated all aspects of Ray's testimony, except for the "ultimate fact" that appellant actually handed the pills to Ray. The same corroboration was provided regarding the June 3 sale: the two phone calls; the locations where events occurred; the amount of money Steve gave to Ray "up front"; the fifteen to twenty minutes appellant said it would take him to arrive; appellant's travel route; the description of the truck; appellant's meeting with Ray; the type of drug; and the type of packaging.

We conclude the additional testimony and the tape recordings provided ample corroboration of the statements in Ray's testimony which "tended to connect" appellant to the offenses charged. The trial court did not err in refusing to give the cautionary instruction on uncorroborated testimony of an accomplice.

Affirmed.