COURT OF APPEALS OF VIRGINIA

**PUBLISHED**

Present:   Chief Judge Decker, Judges Raphael and White
Argued at Richmond, Virginia


JUHWAAN BARNES

                                                    OPINION BY
v.        Record No. 0372-23-2          JUDGE STUART A. RAPHAEL
                                                  SEPTEMBER 3, 2024
COMMONWEALTH OF VIRGINIA


FROM THE CIRCUIT COURT OF THE CITY OF RICHMOND
Claire G. Cardwell, Judge

David B. Hargett (Hargett Law, PLC, on brief), for appellant.

Timothy J. Huffstutter, Assistant Attorney General (Jason S.
Miyares, Attorney General, on brief), for appellee.


Following a jury trial, Juhwaan Barnes was convicted of first-degree murder (Code

§ 18.2-32) and using a firearm during the commission of murder (Code § 18.2-53.1) in a

successful plot to kill Vinshuan Johnson in April 2021.  It was undisputed at trial that five people

were present when Johnson was killed, three men and two women.  The three men were Barnes

and his two friends—Justin Oliver and Kevon Bynum.  The two women were Barnes's friends,

Brianna Stephens and Ashley Carpenter.  All five faced criminal charges in connection with

Johnson's murder.  The two female accomplices, Stephens and Carpenter, testified against

Barnes in the hope of receiving more favorable treatment in the disposition of the criminal

charges against them.

The Commonwealth's theory of the case was that Barnes, Oliver, and Bynum used the

two women to lure Johnson to a dark residential street where the men lay in wait.  When Johnson

arrived, the three men opened fire, killing Johnson.  Barnes's theory of the case, by contrast, was

based on the testimony of the then-convicted Bynum that Bynum alone plotted to kill Johnson and that Bynum alone fired the shots that killed him.

The only issue on appeal is whether there was enough corroboration of the accomplice testimony by Stephens and Carpenter that the trial court was not required to instruct the jury about the danger of convicting a person based on the "uncorroborated" testimony of an accomplice. Finding sufficient evidence to corroborate their testimony, we affirm Barnes's convictions.

BACKGROUND

In the early morning hours of April 7, 2021, Stephens and Carpenter were on their spring break, hanging out together. Carpenter texted Barnes (who goes by the nickname "Waan") to see if he wanted to join them. Carpenter live-streamed herself to her Instagram followers. Johnson (who went by the nickname "Tazz") joined Carpenter's livestream and suggested that they get together. When Barnes also joined the livestream, Carpenter immediately shut it down because she knew that Barnes and Johnson "didn't like each other."

Barnes sent Carpenter an Instagram message asking her to come to his house. At trial, the Commonwealth introduced screenshots of the "Instagram chat window" showing Carpenter's conversation with Barnes. Only Barnes's messages are visible, however, as Carpenter deleted her Instagram account after the murder. Carpenter testified to the substance of her responses to each of Barnes's questions as shown in the screenshots.

On their way to Barnes's residence, Carpenter and Stephens stopped to pick up Oliver. Stephens testified that when they reached Barnes's house, Barnes told Oliver that Carpenter "was on live with an op"—referring to Johnson.[1]

_____

[1] Carpenter's account differed slightly from Stephens's. Carpenter said that *Oliver* made a comment about the two women "being ops . . . because [they] were on live with [Johnson]."

- 2 -

The group then drove to Oliver's house. Carpenter testified that, on the way there, she overheard Barnes and Oliver saying "something about setting [Johnson] up." She recalled that she and Stephens said "no" to that idea. After picking up Oliver, the group then picked up Bynum (who goes by the nickname "Six"). The group was now five strong.

Stephens and Carpenter testified that Stephens's phone was "getting passed around" the car as the men used it to text Johnson, pretending to be Stephens. The men also started telling Stephens and Carpenter where to drive. The men said they should "set up" Johnson, and Barnes was "trying to get [Stephens and Carpenter] to go along with it." Carpenter explained that the men had "made up a little lie" to tell Johnson so he would meet them at a house, which they falsely texted Johnson was the home of Carpenter's father. Carpenter testified that all three men had guns, and she suspected they were going to "try to shoot" or "kill" Johnson. At 3:52 a.m., Stephens texted Carpenter, "I don't like this." Stephens testified that she knew that Barnes had a gun and saw him with it. She believed that the men intended to kill Johnson.

As the group approached the ambush location at the intersection of Montvale Avenue and Wellington Street in the City of Richmond, the men were still "telling [Stephens and Carpenter] what to say" to Johnson. At the men's request, Stephens sent Johnson her location by text message, showing him where they had parked. The text message to Johnson with the location marker, sent around 4:06 a.m., was admitted into evidence. The marker showed that Stephens's phone was at the intersection of Montvale Avenue and Wellington Street.

Carpenter testified that the men got out of the car and walked into an alley behind the houses near where they had parked. Stephens and Carpenter stayed in the car, exchanging texts with Johnson about where to meet, not mentioning that Barnes, Oliver, and Bynum were lying in wait.

At 4:23 a.m., Johnson texted Stephens, "WYA" ("where you at"). Stephens and Carpenter both testified that they saw Johnson walking in the street. Stephens testified that Johnson was walking the wrong way, away from their car, so she texted him, "why y'all walkin dat way," and "come back down." Carpenter saw Barnes, Oliver, and Bynum "creeping from the side of the house."

Carpenter witnessed all three men start shooting at Johnson, while Johnson ran, trying to shoot back. She testified that Barnes and Oliver "stayed on the corner beside where the car was," while Bynum "was on the other side of the street." A diagram showing the location of shell casings recovered from three guns was admitted into evidence as Commonwealth's Exhibit 7. The locations corresponded with Carpenter's description of the places from which the shots were fired from three guns.

Stephens did not see any shooting; she ducked under the steering wheel when she heard "a lot" of gunshots. Barnes, Oliver, and Bynum then returned to the car. As they drove off, Carpenter saw Johnson lying in the middle of the street, wearing an "orange-ish jacket," the same one that he was wearing when she had seen him earlier that morning on her Instagram livestream.

The men told Stephens and Carpenter to delete their Instagrams. The men grabbed Carpenter's phone and deleted her messages with Johnson. They also told Stephens and Carpenter what to say if questioned by the police—that they had seen other people argue and shoot at each other. Carpenter said that the men later called her to make sure that she and Stephens had made it home and to urge her again to keep quiet and to delete her Instagram account.

The police found Johnson lying face down in the middle of the street. A crime-scene photo admitted into evidence shows him wearing the orange jacket described by Carpenter. The

investigating detective testified that he had not shared such crime-scene evidence with any of the witnesses.

The police found a cellphone near Johnson's hand, and a detective (with the family's permission) recovered the text messages. Police also recovered 32 shell casings from three weapons, as well as a damaged and inoperable handgun near Johnson's body. A search of Bynum's residence on Brookfield Street turned up one of the guns that matched the ballistics of some of the recovered shell casings. Police could not find the other two firearms that had ejected the remaining shell casings.

Before Barnes's trial, Bynum was convicted of first-degree murder and use of a firearm to murder Johnson. Stephens admitted at Barnes's trial that she had once testified that she had not seen any of the men with a gun. Stephens and Carpenter also admitted at Barnes's trial that they had initially lied to police about what had happened that night. Both explained that they were now testifying truthfully in the hope of obtaining a more favorable disposition of the charges against them.

Along with the testimony of Stephens and Carpenter, the Commonwealth introduced testimony from the two responding officers, the lead detective, the coroner, and a firearms expert. The Commonwealth also introduced as exhibits:

- pictures of the crime scene;

- the diagram showing where each shell casing was recovered;

- text messages between Stephens and Carpenter;

- text messages between Stephens and Johnson;

- text messages between Carpenter and Johnson;

- the Instagram chat box between Barnes and Carpenter (though only Barnes's messages are visible); and

- a screenshot of Stephens's text message to Johnson showing Stephens's GPS coordinates.

After the court denied Barnes's motion to strike, Bynum was called as a defense witness. Bynum placed Barnes, Oliver, himself, and two women at the scene of the murder. He said he didn't know the names of the two women. Bynum said that he was upset after learning that Johnson had "shot up a house of some [of Bynum's] family members," so Bynum "decided to do something about it" when "the opportunity presented itself." Bynum claimed that neither Barnes nor Oliver knew of his plans to "lure" and "ambush" Johnson. Bynum said that he used the phone of one of the two women to text Johnson to set him up for the ambush, and at other times he told the women what to text. He directed the women to text Johnson their location at the corner of Montvale and Wellington, the place Bynum selected for the ambush.

Bynum claimed that he had two guns with him and that Barnes "definitely" did not have a gun. He didn't know if Oliver was armed. Bynum said that the three men got out of the car to wait for Johnson to arrive. He told the two women to stay in the car. Bynum said that he alone fired shots at Johnson, chasing him down the street until Johnson collapsed. Bynum said that Barnes and Oliver were behind him, so he didn't see what they were doing. Bynum claimed that he was unaware of any other firearms at the scene. He said he pleaded guilty to murdering Johnson and had also been convicted of murdering other people in April 2021, 20 days after killing Johnson.

After the court denied Barnes's renewed motion to strike, Barnes requested the following cautionary instruction based on Stephens and Carpenter's accomplice testimony:

> Ashley Carpenter and Brianna Stephens have testified that they were an accomplice in the commission of the crime charged in the indictment. While you may find your verdict upon their uncorroborated testimony, you should consider the testimony with great care and you are cautioned as to the danger of convicting the defendant upon the uncorroborated testimony of an accomplice.

> Nevertheless, if you are satisfied from the evidence of the guilt of the defendant beyond a reasonable doubt, the defendant may be convicted upon the uncorroborated evidence of an accomplice.

The Commonwealth objected to the instruction, arguing that the testimony of the two accomplices was not "uncorroborated." Finding sufficient corroboration, the trial court denied the proposed instruction.

The jury found Barnes guilty of first-degree murder and use of a firearm in the commission of murder. Barnes was sentenced to 43 years in prison with 19 years suspended.

Barnes noted a timely appeal. His sole assignment of error asserts that the trial court erred in refusing to give the cautionary jury instruction about uncorroborated accomplice testimony.

## ANALYSIS

The responsibility to properly instruct the jury "rest[s] in the sound discretion of the trial court." *Holmes v. Commonwealth*, 76 Va. App. 34, 52 (2022) (quoting *Cooper v. Commonwealth*, 277 Va. 377, 381 (2009)). On appeal, the reviewing court must determine whether "the law has been clearly stated and that the instructions cover all issues [that] the evidence fairly raises." *Id.* (quoting *Fahringer v. Commonwealth*, 70 Va. App. 208, 211 (2019)). "[I]n deciding whether a particular instruction is appropriate, we view the facts in the light most favorable to the proponent of the instruction." *Id.* at 53 (quoting *Cooper*, 277 Va. at 381).

A jury may convict a defendant based solely on accomplice testimony, but if the accomplice testimony is uncorroborated, the trial court must "warn the jury against the danger of convicting upon such uncorroborated testimony." *Dillard v. Commonwealth*, 216 Va. 820, 821 (1976). "*Dillard* makes it clear that if an accomplice's testimony is uncorroborated, it is error for a trial court to refuse the cautionary instruction." *Holmes*, 76 Va. App. at 55. Whether sufficient

- 7 -

corroboration exists is "a question of law" for the trial court, one that we review de novo on appeal. *Id.*

The duty to warn about relying on uncorroborated accomplice testimony has deep roots in Virginia and English law. *See Guthrie v. Commonwealth*, 171 Va. 461, 464-66 (1938) (tracing the rule to its origins "in the ancient doctrine of 'approvement'"). The "historical and common-sense reason" for that duty "is that the witness could otherwise transfer responsibility for a crime from his own shoulders to another's." *Id.* at 466 (quoting *People v. Swift*, 293 N.Y.S. 378, 381 (1936)); *Jones v. Commonwealth*, 111 Va. 862, 868 (1911) ("[T]he danger of collusion between accomplices and the temptation to exculpate themselves by fixing responsibility upon others is so strong[] that it is the duty of the court to warn the jury against the danger of convicting upon their uncorroborated testimony.").

In *Dillard*, our Supreme Court rejected the claim that the corroborating evidence must "support[] the *ultimate fact* that the accused committed the offense charged." 216 Va. at 822. While the evidence "must relate to some fact (or facts) which goes to establish the guilt of the accused," that is different from requiring that it corroborate the "ultimate fact" of guilt. *Id.* at 823 (quoting *Jones*, 111 Va. at 869). "The corroborative evidence, standing alone, need not be sufficient either to support a conviction or to establish all the essential elements of an offense." *Id.*

Rather, accomplice testimony may be corroborated by "material facts [that] tend to connect the accused with the crime, sufficient to warrant the jury in crediting the truth of the accomplice's testimony." *Id.* "This rule applies even though the corroborative evidence falls short of constituting 'independent evidence [that] supports the alleged ultimate fact' that the accused committed the offense charged." *Id.* at 823-24. The evidence is sufficiently corroborating when it connects the defendant to the crime and corroborates the defendant's

"occasion and opportunity for the crime," *Holmes*, 76 Va. App. at 57 (quoting *Dillard*, 216 Va. at 823), and when it is "sufficient to warrant the jury in crediting the truth of the accomplice's testimony," *Smith v. Commonwealth*, 218 Va. 455, 457 (1977) (per curiam) (quoting *Dillard*, 216 Va. at 823). Accomplice testimony, however, "cannot be corroborated by the testimony of another accomplice." *Via v. Commonwealth*, 288 Va. 114, 115 (2014) (per curiam).

Arguing that "there is nothing outside of [Stephens and Carpenter's] testimony to connect Barnes with the shooting," Barnes likens this case to *Smith*. The defendant there asked his accomplice, a woman, to distract the victim so he and another man could rob him. *Smith*, 218 Va. at 456. The woman did so, engaging the victim in a conversation while the defendant and another man "wrestled" the victim to the ground and stole his wallet. *Id.* At trial, the woman identified the defendant, but the victim "was unable to identify the defendant as one of his assailants." *Id.* at 456-57. Finding "no other evidence" to connect the defendant to the crime, the trial court held that the accomplice's testimony was not sufficiently corroborated. *Id.* at 457.

The Commonwealth argues that this case is closer to *Dillard*, where the trial court found sufficient corroboration of the accomplice's story that Dillard had shot and killed a taxi driver while robbing him. 216 Va. at 824-26. The trial court laid out piece-by-piece how various aspects of the accomplice's story about what happened—before, during, and after the shooting— were corroborated by other evidence. *Id.*

- The accomplice testified that he had asked an acquaintance to borrow his gun; the acquaintance confirmed that he loaned the gun to the accomplice. *Id.* at 824.

- The accomplice testified that he and Dillard played cards at a friend's house until dusk; the friend confirmed the card game. *Id.* at 824-25.

- The accomplice testified that he and Dillard "caught a ride" from Dillard's house to a drugstore; the driver confirmed that he took them. *Id.* at 825.

- The accomplice testified that Dillard hailed the victim's cab and got inside by himself; another cab driver witnessed the victim drive away with a single passenger. *Id.*

- The accomplice testified that the cab stopped for him to get in with Dillard, and the accomplice passed the gun to him. *Id.* Upon reaching their destination, when the cab driver turned on the interior light, the accomplice said that Dillard shot the cabdriver twice, and he and Dillard got out of the cab and went in separate directions. A witness across the street saw the cabdriver pull up, heard the shots, and saw two men get out of the cab and move in separate directions. *Id.*

- The accomplice testified that he encountered the acquaintance who loaned him the gun that evening at a bar. The accomplice told the acquaintance about the shooting and robbery, and the accomplice and the acquaintance then went looking for Dillard. The acquaintance corroborated that testimony. *Id.* at 825-26.

- The accomplice testified that he and the acquaintance paid a driver to drive around looking for Dillard; the driver corroborated that testimony. *Id.* at 826.

- The accomplice testified that, later that evening at the bar, his girlfriend told him that Dillard was outside and wanted to see him; the girlfriend corroborated that testimony. *Id.*

- The accomplice testified that, when Dillard gave him a cut of the money taken from the cabdriver, Dillard said that the cabdriver had a gun in his hand; police found a gun in the cabdriver's hand. *Id.*

- The accomplice testified that, after Dillard gave him back the gun, the accomplice returned it to the acquaintance; the acquaintance corroborated that fact. *Id.*

- Finally, the jacket that Dillard wore that night was spattered with blood; the cabdriver had the same blood type. *Id.*

The Court "h[e]ld that, all in all, the accomplice testimony . . . was corroborated in so much of its material facts which tended to connect the defendant with the crimes charged that the jury was warranted in crediting the truth of the testimony." *Id.*

The Court found even less evidence than that to be sufficiently corroborating in *Allard v. Commonwealth*, 218 Va. 988 (1978). The accomplice there said that he and Allard had spent the whole day together, including breaking into a jewelry store and then going to a nearby bar to drink "a few beers." *Id.* at 990-91. A police officer observed the accomplice with Allard at the bar, and Allard asked the officer "who was he looking for." *Id.* at 991. Although Allard denied having participated in the burglary, he admitted to having been with the accomplice "continuously" that day, including at the bar. *Id.* at 991-92. The Court found that the

- 10 -

corroborating evidence "tend[ed] to connect Allard with the crime," particularly since, if the two "were together during the entire evening," the other burglar with the accomplice was Allard. *Id.*

This case is far closer to *Dillard* and *Allard* than to *Smith* because the key portions of the accomplice testimony here were corroborated by other evidence. To start, Bynum's testimony placed Barnes at the scene of the murder alongside Oliver, Bynum, and two women.[2] Stephens's presence as one of those women, and her texting her location to Johnson, were corroborated by the text message sent from Stephens's phone to Johnson. The text message showed the phone's location where the ambush took place—at the corner of Montvale Avenue and Wellington Street. Bynum also testified to having directed one of the women to text the location to Johnson, further corroborating Stephens's account.

Stephens and Carpenter's claims that the three men exited the car at the ambush spot while the two women remained inside were corroborated by Bynum's testimony. Stephens's testimony about seeing Johnson walking in the street at the ambush spot was corroborated by her text messages to Johnson that he was walking the wrong way and should turn around.

Carpenter's testimony that she saw Barnes, Oliver, and Bynum each firing guns at Johnson, with Barnes and Oliver closer to the intersection, was corroborated by the diagram showing the location of multiple cartridge casings from three guns. Two of the clusters were

---

[2] Barnes conceded at oral argument that Bynum is not an "accomplice" for purposes of the corroboration rule. "The general test to determine whether or not a witness is an accomplice [under the corroboration rule] is to determine whether he could be indicted for the same offense." *Guthrie*, 171 Va. at 469. Of course, Bynum was indicted for the murder of Johnson and pleaded guilty. Still, Barnes's proposed jury instruction identified the relevant accomplices as only Stephens and Carpenter. And Barnes has never claimed that Bynum's testimony cannot qualify as corroborating. We need not decide whether Bynum would be considered an "accomplice" under the corroboration rule in the absence of Barnes's concession. We "accept the concession—not as a basis for deciding the contested issue of law, but as a basis for not deciding it." *Commonwealth v. Holman*, 303 Va. 62, 75 (2024) (quoting *Logan v. Commonwealth*, 47 Va. App. 168, 172 n.4 (2005) (en banc)).

close to the corner of Montvale and Wellington, and the third cluster was further down Montvale, nearer to where Johnson's car was parked. And Carpenter's testimony that she saw Johnson lying in the street in the same orange jacket she had seen him wearing earlier that day was corroborated by the crime-scene photograph showing Johnson in an orange jacket.

Stephens and Carpenter's testimony about texting with Barnes and Johnson earlier in the evening was also corroborated by the text messages themselves. And the women's accounts about the men using one of the women's phones to text Johnson, luring him to the ambush site, were corroborated both by the text messages themselves and by Bynum's testimony that that is exactly what happened.

CONCLUSION

While every piece of Stephens and Carpenter's testimony may not have been corroborated, that was not required. *Dillard*, 216 Va. at 823; *Holmes*, 76 Va. App. at 56. The testimony that was corroborated sufficed to show Barnes's "occasion and opportunity" to commit the crime. *Holmes*, 76 Va. App. at 57 (quoting *Dillard*, 216 Va. at 823). It was also "sufficient to warrant the jury in crediting the truth of the accomplice[s'] testimony." *Smith*, 218 Va. at 457 (quoting *Dillard*, 216 Va. at 823). Accordingly, the trial court did not err in refusing the cautionary instruction.

*Affirmed.*