COURT OF APPEALS OF VIRGINIA

Present: Judges Decker, Russell and AtLee
Argued at Richmond, Virginia

UNPUBLISHED

RYAN ONEAL DAVIS

MEMORANDUM OPINION* BY
v.       Record No. 0615-17-2       JUDGE WESLEY G. RUSSELL, JR.
                                     JULY 17, 2018

COMMONWEALTH OF VIRGINIA

FROM THE CIRCUIT COURT OF SUSSEX COUNTY
Robert G. O'Hara, Jr., Judge Designate

Jessica V. Bailey for appellant.

John I. Jones, IV, Assistant Attorney General (Mark R. Herring,
Attorney General, on brief), for appellee.

Ryan Oneal Davis (appellant) was convicted by a jury of first-degree murder after having

twice been convicted of a violent felony. On appeal, he argues the trial court erred in admitting the

autopsy report in its entirety rather than in redacting certain opinions contained in the report.

Appellant also argues that the evidence was insufficient to support his murder conviction. For the

reasons stated below, we affirm.

PROCEDURAL HISTORY

Appellant was originally convicted for the murder of Cherri Dowell on January 11, 2008.

Specifically, a jury in the Circuit Court of Sussex County found him guilty of first-degree murder

after having been twice convicted of a violent felony. This Court affirmed the conviction in an

unpublished opinion. Davis v. Commonwealth, No. 0142-08-2, 2009 Va. App. LEXIS 260

(Va. Ct. App. June 9, 2009). Appellant subsequently filed a petition for a writ of *habeas corpus*

---

* Pursuant to Code § 17.1-413, this opinion is not designated for publication.

asserting several bases for a claim of ineffective assistance of counsel. Among other arguments, he claimed that he was

> denied the effective assistance of counsel because counsel failed to object to the admission of a portion of the autopsy report which stated an opinion as to an ultimate issue of fact at trial. [Davis] contends that counsel should have objected to a portion of the summary that stated that the cause of death could not be determined and that "[d]ue to the blunt force injuries, homicidal violence is a distinct possibility" and that "[t]he decompositional change could obscure anatomic evidence of an asphyxial death."

In denying the petition, the Supreme Court of Virginia held that this specific claim was meritless and that any objection by counsel that the admission of the autopsy report invaded the province of the jury regarding the ultimate issue would have been "futile." Davis v. Warden of the Wallens Ridge State Prison, Record No. 101851 (May 25, 2011). Specifically, the Supreme Court held that

> the medical examiner testified that the cause of the victim's death was undetermined, that abrasions seen on the victim's body could have been the result of a fight, that there had been some decomposition of the body, and that it was difficult to determine if the victim had an asphyxial type of death because of the position in which the body was found. Nothing in the testimony or in the autopsy report went to the ultimate issue at trial, which was whether petitioner murdered the victim.

Id.

Appellant ultimately sought habeas relief from the federal courts as well. The federal district court granted his petition on an unrelated issue. Davis v. Mathena, 2014 U.S. Dist. LEXIS 44757 (E.D.Va. Mar. 27, 2014). As a result of this ruling, appellant was granted a new trial, which resulted in the conviction that is the subject of this appeal.

FACTUAL BACKGROUND

"Under well-settled principles of appellate review, we consider the evidence presented at trial in the light most favorable to the Commonwealth, the prevailing party below." Smallwood

v. Commonwealth, 278 Va. 625, 629, 688 S.E.2d 154, 156 (2009) (quoting Bolden v. Commonwealth, 275 Va. 144, 148, 654 S.E.2d 584, 586 (2008)). This principle requires us to "discard the evidence of the accused in conflict with that of the Commonwealth, and regard as true all the credible evidence favorable to the Commonwealth and all fair inferences to be drawn therefrom." Parks v. Commonwealth, 221 Va. 492, 498, 270 S.E.2d 755, 759 (1980) (emphasis and internal quotation marks omitted).

On June 12, 2006 the victim, Cherri Dowell, told a co-worker, Barbara Gray, that she was afraid of Davis, with whom she was acquainted. Specifically, Dowell said her fears were aroused because she had noticed some of her money missing and that her car tires had been slashed. Dowell's report to Gray was consistent with a statement she had made to Jamica Giles approximately two weeks earlier. At that time, Dowell told Giles that she was afraid of Davis because he had made threats and harassed her.

On June 13, 2006, Dowell did not report for work or notify her employer that she would not be at work. Finding this unusual, Gray drove to Dowell's house in Waverly to check on her. Gray noticed a raised window and that the storm door was "swung back." She did not get out of her car, hoping Dowell would come outside. Gray also noticed that Dowell's car was missing. After twenty minutes, Gray left the house, went back to the school where she worked, and contacted the police. The police indicated that they would conduct a welfare check on the house and Dowell.

Captain Ernest Giles of the Sussex County Sheriff's Office responded to the house to conduct the welfare check. He was accompanied by Waverly Police Chief Davis. Giles noticed the open front window and that Dowell's car was missing from the carport. Giles found the storm door unlocked, so he announced their presence and went inside. Giles and Chief Davis searched the house and found Dowell, unclothed and deceased, lying face down in a back

bedroom. Giles noticed a large hole in the wall above Dowell's head. At that point Giles and Chief Davis called for investigators.

Giles was sent to find appellant, whom he had known "all of [his] life." Appellant's mother directed Giles to appellant's house, and Giles eventually gave appellant a ride to the police station, although he assured appellant he was not being detained or arrested. Giles told appellant that Captain Gwaltney of the Waverly Police Department wanted to talk to him.

During his interview with appellant on June 13, Gwaltney noticed and photographed scratch marks on appellant's chest and neck. Appellant told Gwaltney that he received them playing basketball on June 12. After completing the Miranda rights waiver, appellant spontaneously asked, "this is about Cherri, isn't it[?]" Appellant then stated that the last time he saw Dowell was when he spoke with her two weeks prior to June 12. He claimed that she apologized to him for having had him arrested previously. He then stated that he saw her three days later, that she apologized again, and that they engaged in consensual sex. Then, appellant stated that the last time he saw her was on June 12 downtown and he waved at her. He claimed he did not see her at all after that. Appellant told Gwaltney that he had been drinking and smoking marijuana with "Tim" the evening of June 12, that they drove to Petersburg that night, and "hooked up" with two unknown females. The next day appellant hitched a ride back to Waverly with an unknown male.

In a subsequent conversation with Giles at the police station, appellant told Giles that on June 12 he saw Dowell downtown around 3:00 p.m. and waved to her. Later that same evening he met up with a male friend around 11:30 or 11:45 p.m. and sat on his mother's porch drinking beer. Appellant then decided to go to Dowell's residence to "have a little sex." Upon reaching her house, he knocked on the front door, and was greeted by Dowell, who was wearing a nightgown. They went to a back bedroom, but he later decided he did not want to have sex with

- 4 -

her and he started to leave. She did not want him to leave, and each time he tried, she would grab him and he kept pushing her back. The last time she came at him she jumped on his back and scratched his chest. He said that he then "spontaneously" turned around and elbowed her and she fell to the bed. She raised her head and called him a derogatory name. After turning off the lights, appellant left the residence through the front door and drove away in her car in order to make her angry.

After his conversation with Giles, appellant was again given his <u>Miranda</u> warnings, waived them, and spoke again with Gwaltney. He advised Gwaltney that everything he said earlier was a lie. Appellant stated that at approximately midnight on June 12 he went to see Dowell and she let him into her residence. They got into an argument, and he pushed her to the ground and she scratched him. He elbowed her in the mouth and that knocked her back onto the bed. Dowell cursed at him, and he left between 12:30 and 1:00 a.m., stole her car, and drove to the Waverly swimming pool.

Kevin Diggs, an investigator with the Sussex County Sheriff's Department, conducted a preliminary survey of the crime scene.[1] He observed lamps overturned, a picture turned sideways on the wall, an irregular smearing pattern where the victim lay, and a bent curtain rod above a window. He also collected a black shirt belonging to appellant and sent it to the lab because it contained a dark stain. Appellant later asked to speak with Diggs while appellant was incarcerated. Appellant and Diggs had known each other since childhood. After waiving his <u>Miranda</u> rights, appellant told Diggs that when he arrived at Dowell's house she was on the telephone. He knocked on the back door, and she let him in. They sat on the bed, talked, and began foreplay for sex, but appellant then decided that he was no longer interested and wanted to

---

[1] Investigator Diggs died before appellant's retrial, so his testimony from appellant's previous trial was read into the record by Investigator McKenzie.

leave. Dowell accused him of going to see "Cindy," and he was surprised that she knew about "Cindy." Dowell then grabbed him, and he pushed her in her chest. She fell on the bed, got up, and scratched him. He pushed her again, and she fell on the bed and shouted an obscenity at appellant. He left the residence and drove away in Dowell's car.

The court qualified Dr. Sarah Williams, an assistant professor of forensic science at Virginia Commonwealth University, as an expert in DNA forensics. She tested fingernail clippings from Dowell and testified that the DNA profile from the clippings contained a mixture of DNA from Dowell and a foreign contributor. Appellant could not be eliminated as the foreign contributor. In addition, Dowell could not be eliminated as a contributor to the stain on the outer upper left sleeve of the black shirt previously submitted to the lab.

The Commonwealth also called Deborah Kay, Assistant Chief Medical Examiner for Virginia, to testify. Kay performed an autopsy on Dowell on June 14, 2006 and produced a report of her findings. Prior to trial, appellant filed a motion *in limine* seeking to prevent the Commonwealth from offering as evidence "Kay's opinion, *either via testimony or in the Report of Autopsy*, as to how decedent's injury occurred." (Emphasis added). Specifically, appellant moved the trial court to redact the portions of the autopsy report that read: "the residence was in disarray suggesting a struggle had taken place" and "homicidal violence is a distinct possibility. The decompositional change could obscure anatomic evidence of an asphyxia death." In addition to the redactions, appellant sought an order directing that Kay not be allowed to give testimony of a similar nature.

In support of his motion, appellant argued that these opinions went to the ultimate issue, and thus, improperly invaded the province of the jury. He also noted that Kay conceded in the autopsy report that "'the cause of death cannot be determined with certainty.'" The court denied the motion by written order dated February 27, 2017.

At trial, Kay testified that she observed several abrasions and bruises on Dowell's body. Kay was unable to determine the source and precise timing of the injuries and testified that the injuries "could be as a result of a struggle or something else. Some . . . could be due to [Dowell's] positioning after death." Ultimately, Kay opined at trial that "one is left with saying the cause and manner of death is undetermined." Kay also found indications of possible asphyxia including hemorrhaging in Dowell's eyes, but testified that it could also have been the result of decomposition. Kay testified that her findings did not preclude the possibility that Dowell was smothered or had her neck compressed, possibly in a chokehold or simply pressing on the carotid artery.

During Kay's testimony, Davis again objected to certain of Kay's opinions being admitted into evidence whether through live testimony or the autopsy report. He objected both on ultimate issue grounds and foundation grounds, arguing that Kay did not hold the opinions to a reasonable degree of forensic certainty. After a lengthy argument outside the presence of the jury and a recess to review the issue, the trial court, citing the Supreme Court's decision regarding Davis' state *habeas corpus* petition, overruled his objections.

On cross-examination, Kay testified that Dowell weighed 332 pounds and that she suffered from some heart abnormalities. She could not say with certainty whether a heart condition contributed to or caused her death. The autopsy report was admitted into evidence in its entirety.[2]

---

[2] The autopsy report stated "Undetermined" under the "Cause of Death" heading, but in the "Summary" section provided, in pertinent part, as follows

> This thirty-five year old black female was found face down between a bed and a wall in her residence. The residence was in disarray suggesting a struggle had taken place. Analysis of a shirt . . . revealed DNA of the deceased and another person on it . . . . Postmortem examination revealed superficial blunt trauma to the head and extremities. There was scalp hemorrhage with a vital

James Reese testified that he was appellant's cellmate while they were incarcerated together in Sussex County. Reese testified that appellant told him that appellant went to Dowell's house with the intent to steal money from her. He entered through a window and pulled down the curtain rod, which caused some noise. Dowell was on the phone at the time, but hung up. She recognized appellant and tried to protect herself from him with an iron. Appellant told Reese that he worried about the fact that she recognized him and would call the police. He feared that he would go to jail for a long time, so he "yoked her up," meaning he placed Dowell in a chokehold. She panicked and scratched him, so he kept holding onto her until she was motionless. Appellant let her go, and her head hit the wall as she fell to the floor. Appellant left through the front door, careful not to leave fingerprints. He then took Dowell's car, met up with a friend, and smoked crack all night. Reese indicated that appellant told the same version of events on several occasions. Reese explained that appellant kept referring to Dowell as "the bitch" and had a look in his eyes that bothered Reese. Reese also perceived that appellant was showing no remorse.

Appellant testified at his trial and told the jury that he and Dowell were friends. On June 12, 2006, he played basketball around 4:00 p.m. and was scratched on his neck during the game. He acknowledged that he previously told Gwaltney or Giles that Dowell had scratched him as he was leaving her house that evening and those scratches were reflected in the photographs they had taken.

---

reaction and hypoxic neuronal change in the brain indicating a survival period. No lethal head trauma was present. Minor heart abnormalities were found. . . . The cause of death cannot be determined with certainty. Due to this the cause and manner will be certified as undetermined. Due to the blunt force injuries, homicidal violence is a distinct possibility. The decompositional change could obscure anatomic evidence of an asphyxial death.

Appellant testified that he went to Dowell's house at approximately 8:00 p.m. that evening. Dowell was on the phone when he arrived. She remained on the telephone for five to ten minutes and then hung up. He and Dowell had a disagreement about his seeing another woman, and she was upset when he began to leave. She grabbed him, causing him to turn around. He said he accidentally elbowed her in the face and nose. When her nose started bleeding, she sat down on the bed, and he offered her his shirt to stop the blood flow. Appellant left the house around 9:30 p.m. He claimed that Dowell was still sitting on the bed holding her head back to stop the nosebleed when he left.

Appellant testified that he had several documents, such as newspaper articles, preliminary hearing transcripts, and certificates of analysis in his jail cell. He claimed he never discussed Dowell with Reese except to recount the preliminary hearing, although he did share all of his documents with Reese. Appellant stated that he never told Reese he "yoked" Dowell.

During a very argumentative cross-examination, appellant denied ever pushing Dowell, and denied most of the statements he made to Gwaltney and Giles. He accused them of being "inadequate" in their reports because they never took any notes. Regarding his conversations with Reese, appellant acknowledged that there was never any testimony during the preliminary hearing about a yoking, there was nothing ever reported in the news media about yoking or a chokehold, but one newspaper article reported Dowell was strangled with an extension cord. Appellant maintained that he did not tell the officers anything, that he did not have any conversations with Reese, and that he did not steal Dowell's car.

In rebuttal, Sergeant James Shanko of the Sussex County Sheriff's Office testified that Reese was held in the Sussex County jail from February 28 to May 8, 2007. Detective Derrick McKenzie testified that he spoke with Reese after he had been transferred from the Sussex County jail and that the transcript of appellant's preliminary hearing indicated that it was transcribed on

May 14, 2007, suggesting that Reese never had access to the transcript. The parties stipulated that the preliminary hearing occurred on January 29, 2007. Appellant claimed on surrebuttal that his attorney had been provided a version of the transcript other than the official version prior to Reese's transfer from the Sussex facility and that Reese had access to that document.

The jury convicted Davis of murder after having twice been convicted of violent felonies. He was sentenced to life in prison.

Davis now appeals his conviction, asserting two assignments of error. First, he argues that

> [t]he trial court erred when it allowed the Commonwealth to enter the autopsy report into evidence in its complete form without redacting certain opinions over appellant's objection because said opinions were not based in fact and were unduly prejudicial to the appellant.

He also argues that the evidence was insufficient to support his conviction for murder.

ANALYSIS

I. Admission of the Unredacted Autopsy Report

In considering appellant's first assignment of error, we note that we are "limited to reviewing the assignments of error presented by the litigant." Banks v. Commonwealth, 67 Va. App. 273, 289, 795 S.E.2d 908, 916 (2017) (citations omitted); see also Rule 5A:12(c)(1)(i) ("Only assignments of error assigned in the petition for appeal will be noticed by this Court."). Accordingly, we will "not consider issues touched upon by the appellant's argument but not encompassed by his assignment of error." Banks, 67 Va. App. at 290, 795 S.E.2d at 916.

By its express terms, appellant's first assignment of error is limited to the trial court's decision to allow "the autopsy report into evidence in its complete form without redacting certain

opinions" because those opinions did not have a sufficient foundation.[3]  Thus, other evidentiary decisions of the trial court to which appellant lodged objections below, such as admitting Kay's testimony regarding her findings, are not before us on appeal.

This limitation on our review is significant because the autopsy report was not the only source of Kay's opinions at trial.  The Commonwealth called Kay to testify, and, in her testimony, she offered all of the opinions from the autopsy report that appellant argued at trial and continues to argue on appeal should have been redacted from the report.  Thus, even if the trial court had redacted the autopsy report as appellant requested, the jury would have been exposed to the exact same information from the medical examiner.

As a result, even if we assume that the Commonwealth failed to lay a sufficient foundation for the admission of the autopsy report into evidence and that the trial court erred in admitting the unredacted report, any such error was harmless.  A non-constitutional evidentiary "error is harmless if when all is said and done, we can conclude that the error did not influence the [factfinder], or had but slight effect."  Va. Bd. of Med. v. Zackrison, 67 Va. App. 461, 484, 796 S.E.2d 866, 877 (2017) (internal quotation marks and citations omitted); see also Code § 8.01-678 (requiring harmless error review in all cases).  Given that Kay's opinions were before the jury regardless of how the trial court dealt with the autopsy report, we can say with virtual

---

[3] The Commonwealth notes that appellant's first "assignment of error . . . raise[s] a foundation issue rather than an ultimate issue challenge, but the substance of his argument . . . on appeal [focuses on] ultimate issue arguments."  Reasoning that the foundation and ultimate issue objections are distinct, the Commonwealth argues that the ultimate issue argument is outside of the assignment of error, and therefore, is not before us.  Although we agree that the objections are distinct and that the ultimate issue objection does not fall within the assignment of error, the argument section of appellant's brief contains sufficient reference to the foundation objection raised in the trial court to place that issue before us.  Accordingly, we decline the Commonwealth's invitation to treat the assignment of error as abandoned.

certainty that, assuming the admission of the unredacted report was error, any such error was harmless.[4]

In oral argument in this Court, appellant, with credible candor, conceded both that the admission of Kay's testimony was outside the scope of the assignment of error and that the admission of Kay's testimony extinguished any potential harm that could have been caused by the admission of the unredacted autopsy report. Recognizing that these facts are fatal to the assignment of error as written, appellant asked us to utilize the "ends of justice exception" to expand the scope of the assignment of error to also encompass the admission of Kay's testimony.

The limited "ends of justice" exception is found in Rule 5A:18 and only applies to a failure of a party to make a contemporaneous objection in the trial court. It has no counterpart in Rule 5A:12 regarding the scope of assignments of error. As we have previously recognized, there is no "ends of justice exception" that allows us to expand a litigant's assignment of error. See Thompson v. Commonwealth, 27 Va. App. 620, 626, 500 S.E.2d 823, 826 (1998) ("[U]nlike Rule 5A:18, Rule 5A:12 contains no 'good cause' or 'ends of justice' exceptions. Accordingly, we will not consider appellant's manifest injustice argument on appeal."). As a consequence, we are unable to grant appellant's request to expand his first assignment of error.

## II. Sufficiency of the Evidence

In his second assignment of error, appellant argues that the trial court erred in denying his motion to strike the Commonwealth's evidence. Specifically, appellant contends that the evidence failed to prove that he murdered Dowell.

---

[4] Given our conclusion that any error was harmless, we do not reach the question of whether the trial court actually erred in admitting the unredacted report. See Commonwealth v. White, 293 Va. 411, 419, 799 S.E.2d 494, 498 (2017) (recognizing that "[t]he doctrine of judicial restraint dictates that we decide cases on the best and narrowest grounds available . . . [and that] the best and narrowest ground [can be the] conclusion that the alleged trial court error, if error at all, was harmless as a matter of law" (internal quotation marks, citations, and footnote omitted)).

In reviewing the sufficiency of the evidence, we examine a jury's factual finding "with the highest degree of appellate deference." Thomas v. Commonwealth, 48 Va. App. 605, 608, 633 S.E.2d 229, 231 (2006). The only "relevant question is, after reviewing the evidence in the light most favorable to the prosecution, whether *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Sullivan v. Commonwealth, 280 Va. 672, 676, 701 S.E.2d 61, 63 (2010) (emphasis added).

This deferential appellate standard "applies not only to the historical facts themselves, but the inferences from those facts as well." Clanton v. Commonwealth, 53 Va. App. 561, 566, 673 S.E.2d 904, 907 (2009) (*en banc*) (internal quotation marks omitted). "Thus, a factfinder may 'draw reasonable inferences from basic facts to ultimate facts,'" Tizon v. Commonwealth, 60 Va. App. 1, 10, 723 S.E.2d 260, 264 (2012) (quoting Haskins v. Commonwealth, 44 Va. App. 1, 10, 602 S.E.2d 402, 406 (2004)), "unless doing so would push 'into the realm of *non sequitur*,'" id. (quoting Thomas, 48 Va. App. at 608, 633 S.E.2d at 231).

Here, perhaps the most damning piece of evidence against appellant is his confession to Reese that he placed her in a chokehold until she was motionless. His statement to Reese detailed his presence at Dowell's home on the night she died. It provides his motive to kill as opposed to merely disabling her because Dowell could identify him as the person who broke into her home. Finally, it provides the manner in which the killing was accomplished.

Clearly, the jury accepted Reese's testimony as true. In doing so, it was fulfilling the factfinder's well-established role as *the* judge of the credibility of witnesses and the weight to be given their testimony. Sandoval v. Commonwealth, 20 Va. App. 133, 138, 455 S.E.2d 730, 732 (1995). That appellant offered a conflicting account and attempted to explain how Reese could know details regarding the event absent appellant's confession to him does not alter the analysis. Just as it could credit Reese's testimony, the jury, as factfinder, was "entitled to disbelieve the

self-serving testimony of the accused and to conclude that [appellant was] lying to conceal his guilt." Marable v. Commonwealth, 27 Va. App. 505, 509-10, 500 S.E.2d 233, 235 (1998). Because the jury's credibility determination was not plainly wrong, we cannot disturb it on appeal. Smith v. Commonwealth, 56 Va. App. 711, 718, 697 S.E.2d 14, 17 (2010).

Appellant next argues that his confession to Reese is uncorroborated, and therefore, is insufficient to establish the *corpus delicti* underlying his conviction.[5] Although it is true that "*corpus delicti* cannot be established by the uncorroborated extrajudicial confession of the accused alone . . . ," Canady v. Commonwealth, 214 Va. 331, 333, 200 S.E.2d 575, 576 (1973), only "*slight corroboration* of the confession is required to establish *corpus delicti* beyond a reasonable doubt," Cherrix v. Commonwealth, 257 Va. 292, 305, 513 S.E.2d 642, 651 (1999) (emphasis added). The slight corroboration "need not be 'of all the contents of the confession, or even all the elements of the crime.'" Allen v. Commonwealth, 287 Va. 68, 74, 752 S.E.2d 856, 860 (2014) (quoting Watkins v. Commonwealth, 238 Va. 341, 348, 385 S.E.2d 50, 54 (1989)). Slight corroboration may be proved by either direct or circumstantial evidence. Watkins, 238 Va. at 348, 385 S.E.2d at 54.

Here, there is ample corroboration of appellant's confession.[6] In the days leading up to her death, Dowell informed multiple people that she was afraid of appellant. She believed he

---

[5] In Latin, "*corpus delicti*" literally means "body of the crime." In modern usage, "[t]he phrase reflects the simple principle that a crime must be proved to have occurred before anyone can be convicted for having committed it." Corpus delicti, Black's Law Dictionary (10th ed. 2014).

[6] In addition to confessing to Reese on multiple occasions, appellant made multiple statements to police. Although, unlike his multiple statements to Reese, his statements to police were not consistent and were often contradictory, multiple versions of his statements to police placed him in Dowell's home on the night of the murder engaged in a physical altercation with Dowell. In some of these statements, appellant explained details regarding Dowell scratching him and Dowell bleeding on his shirt that were consistent with the physical, DNA, and blood evidence discovered by police.

had stolen money from her and slashed her tires. She also reported that he had made threats and had been harassing her.

Furthermore, the physical evidence discovered by police corroborates appellant's confession. The scene of the crime was consistent with a struggle as lamps were overturned, a picture had been knocked astray, and a curtain rod had been bent. In at least some of his extrajudicial confessions, appellant noted that the confrontation occurred in Dowell's bedroom and that her head hit the wall after he released his chokehold. Dowell was found in the bedroom with her head next to a hole in the wall. The scratches observed on appellant and his bloody shirt being found at the scene were also consistent with his inculpatory statements. Furthermore, the blood and DNA evidence buttressed the conclusion that there had been a physical confrontation between Dowell and appellant that night. Finally, although a cause of death could not be definitively determined, the evidence at autopsy was consistent with a death by asphyxiation. Each of these factors was consistent with portions of appellant's various confessions and was sufficient to corroborate those extrajudicial statements, including the confession given to Reese.

Appellant's final sufficiency argument is that the evidence is insufficient to establish that Dowell died as a result of his actions as opposed to natural causes. According to appellant, Kay's inability "to determine a cause of death for [] Dowell is enough for this Court to find that the Commonwealth did not prove that [] Dowell's death resulted from the criminal agency of another person." We disagree.

Forensic opinions regarding the precise cause of death are not necessary to establish that death was caused by another person's criminal agency. See, e.g., Bowie v. Commonwealth, 184 Va. 381, 390, 35 S.E.2d 345, 349 (1945) (affirming conviction but recognizing that "[a]n examination of the body of a dead person will not always disclose whether death was from natural causes or by means of violence"). If this were not so, no homicide prosecution could

occur without the victim's body having been subjected to an autopsy. This is simply not the law. Edwards v. Commonwealth, 68 Va. App. 284, 297, 808 S.E.2d 211, 217 (2017) (affirming murder conviction in absence of a body and "recognizing that no law exists in Virginia requiring the Commonwealth to produce a victim's dead body to obtain a conviction for murder"). Here, the totality of the evidence, including appellant's confession that he choked Dowell and Kay's opinion that the autopsy results were not inconsistent with death by asphyxiation, is sufficient to establish that Dowell died as a result of appellant's criminal agency. See Aldridge v. Commonwealth, 44 Va. App. 618, 652, 606 S.E.2d 539, 556 (2004) (affirming conviction where medical examiner's opinion that death was caused by drowning was based on defendant's confession that she had drowned the victim and the autopsy results revealing "'nothing inconsistent with the diagnosis of drowning'").

CONCLUSION

For the reasons stated above, the trial court did not commit reversible error regarding the admission of the autopsy report or in finding that the evidence was sufficient to support appellant's conviction for first-degree murder after having twice been convicted of a violent felony. Accordingly, we affirm the judgment of the trial court.

Affirmed.